**HOLMES v. HOUSTON et al.    (No. 819.)**

(Court of Civil Appeals of Texas. Beaumont. May 27, 1922. Rehearing Denied June 7, 1922.)

1. Wills ⊙⟞166(3)—Evidence held insufficient to sustain finding of undue influence.

Evidence *held* insufficient to show that a will contested by a brother and nephew leaving the bulk of the decedent's property to a man with whom she sustained illicit relations, was induced by undue influence.

2. Wills ⊙⟞158—Illicit relations do not constitute undue influence or invalidate will.

Illicit relations between a testatrix and the chief beneficiary under the will do not of themselves constitute undue influence or render the will invalid, though provable as a circumstance, to be considered with other facts and circumstances on the question of undue influence.

3. Wills ⊙⟞166(5)—That will is unnatural or unjust does not prove undue influence.

That a will was unreasonable and unnatural, or even unjust, does not of itself prove undue influence or warrant the setting aside of the will.

4. Wills ⊙⟞166(6)—That will varies from previously expressed intentions does not show undue influence.

That a will failed to carry out intentions previously expressed by the testatrix as to the disposition of her property is not sufficient, in the absence of something more cogent and of stronger probative force, to show undue influence, but is admissible as a circumstance bearing on such issue.

**5. Wills ⊕166(1)—Evidence of "undue in-fluence" which will annul a will defined.**

Before a will may be annulled on the ground of undue influence, the evidence must show with reasonable certainty that such influence was exercised before the testament was made, and operated upon the mind of the testator at the time of its execution, that such influence, so far controlled and subverted the testator's mind and will power as to render him unable to resist it, and that, in consequence of such in-ability, the testament reflected and expressed the mind and will of the beneficiary, and not that of the testator.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Undue Influence.]

**6. Wills ⊕166(12)—When proof of circum-stances sufficient to show undue influence stated.**

Undue influence in connection with the exe-cution of a will may be shown by circumstances, but the circumstances must be so connected and of such probative force as to lead a well-guarded mind to a reasonable conclusion that such influence was exercised prior to the execu-tion of the will and operated upon and con-trolled the will power of the testatrix at the time of its execution.

**7. Appeal and error ⊕1001(1)—Verdicts and judgments set aside, when evidence wholly and manifestly insufficient.**

The Court of Civil Appeals has authority, and it is its duty, to reverse and set aside verdicts and judgments when the evidence upon which they are based is wholly and manifestly insufficient to sustain them when measured by the rules of law.

Appeal from District Court, Harris Coun-ty; J. D. Harvey, Judge.

Proceeding by Harry E. Holmes for the probate of a will, to which R. J. Houston and others filed objections. From a judgment against the will, the proponent appeals. Re-versed and remanded.

Blake Dupree, of Houston, and N. P. Woodward, of Temple, for appellant.

S. H. Brashear and Hutcheson, Bryan & Dyess, all of Houston, for appellees.

HIGHTOWER, C. J. This is an appeal from a judgment of one of the district courts of Harris county, refusing to probate the will of Maud Houston, deceased.

Maud Houston died in the city of Houston, Harris county, Tex., on December 15, 1919, leaving a will by which she devised and be-queathed to Harry E. Holmes, the appellant, the greater part of her property, which was worth, in the aggregate, at the time of her death, between $25,000 and $35,000, as best we can estimate from the record. At the time of her death, she left as her only legal heirs her brother, Robert J. Houston, and a nephew, Clyde Houston, who was the son of another of her deceased brothers. In the

will appellant, Harry E. Holmes, was named as independent executor, and the testatrix provided that the probate court should have nothing more to do with the management or direction of her estate than was required by the law. By the first clause of the will, she directed that her body be buried in a decent and Christianlike manner, suitable to her circumstances and condition in life. By the second clause, she directed that all of her just debts be paid by her executor without delay. By the third clause, she bequeathed and devised to her brother, Robert J. Hous-ton, $3,000. By the fourth clause she be-queathed and devised to her namesake, Maud Houston, a daughter of Robert J. Houston, the sum of $1,000, and, in addition thereto, the proceeds of a policy which she held in the Lodge of Woodmen Circle of Harrisburg, Tex., or so much as should remain after her funeral expenses, etc., were paid. By the fifth clause, she devised and bequeathed to Mrs. Lucy E. Curry, of San Antonio, Tex., all of her household goods in her summer home at Seabrook, Tex., with the exception of a victrola, and, in addition thereto, her diamond rings and $500 in cash. By the sixth clause, she devised and bequeathed to appellant, Harry E. Holmes, all of the remainder of the property then owned by her, of whatsoever nature and character, including block No. 57 in the town of Seabrook, Tex., and the improvements on the same. The will was witnessed by Judge Blake Dupree and Dr. Warren M. Wier, and was dated October 9, 1919.

Within a few days after the death of Maud Houston, Harry E. Holmes offered the will for probate in the county court of Harris county, and Robert J. Houston and Clyde Houston objected to its probate, and con-tested the will on two grounds: (1) That Maud Houston, at the time she executed the will, lacked testamentary capacity; and (2) that the will was the result of undue in-fluence exercised upon and over her by the proponent, Holmes, and the said Mrs. Lucy E. Curry. To these grounds of contest the proponent answered by a general denial, and specially denied the truth of either of them. Afterwards Robert J. Houston died, and his widow intervened on behalf of herself and the children of herself and husband. Miss Hortense Houston, a daughter of Robert J. Houston by a former wife, also intervened. These interveners adopted the grounds of contest as made by Robert J. Houston and Clyde Houston.

The contest proceeded to a hearing in probate court, and the result was a judgment by that court admitting the will to probate, and denying the contest. Upon appeal to the district court, on a trial before a jury, the case was submitted upon one special issue, and that was whether or not the will was the

result of undue influence, as claimed by contestants. The issue of testamentary capacity was not submitted for the jury's consideration, for the very manifest reason, as disclosed by the record, and as substantially admitted by counsel for appellees in a supplemental brief, that there was no evidence to warrant the submission of that issue to the jury. The jury's verdict consisted of a finding that undue influence was exercised, as claimed by contestants, and judgment was entered in accordance with the verdict refusing to probate the will. After his motion for new trial was overruled, appellant, in due time, prosecuted an appeal, assigning a number of grounds for reversal, all of which we have carefully considered, and none of which we think should be sustained, except his contention that the finding of the jury that the will was the result of undue influence was and is without support in the evidence adduced upon the trial, and this contention we have concluded must be sustained.

[1] In order to make our views upon this point understood, it becomes necessary to mention at some length the facts and circumstances pertaining to the issue of undue influence, as they were adduced upon the trial. At the outset, we state, without fear of successful contradiction by anything shown in the record, that there was no direct or positive evidence showing or tending to show that Maud Houston's will was the result of any undue influence exercised over her by either Harry E. Holmes or Mrs. Curry, or anyone else, at the time the will was executed. Appellees contend, however, that there were many cogent circumstances before the jury tending to prove and sufficient to prove that the will was the result of undue influence practiced and exercised by Holmes and Mrs. Curry, or one of them, and especially Holmes, and that such undue influence caused Maud Houston to execute the will as she did. We may mention, generally, such circumstances as are pointed out by counsel for appellees, which they contend were sufficient to authorize a finding by the jury that such undue influence was exercised, and that it operated upon Maud Houston and brought about the will. First, appellees contend that the proof showed that Harry E. Holmes and Maud Houston, for many years prior to her death, sustained to each other illicit relations and lived in adultery. It is next contended that Holmes, previous to the execution of the will and previous to the fatal sickness of Maud Houston, tried to prevail upon her to convey to him at that time by deed all the property of which she was then possessed. It is next contended that the will was an unnatural, unusual, and an unreasonable one, It is next contended that the provisions of the will were contrary to Maud Houston's intentions and purposes, as previously expressed by her. It is next contended that

there was the greatest opportunity for the practice and exercise of undue influence by Holmes and Mrs. Curry immediately before and at the time of the execution of the will. These, we say, are the main facts and circumstances, as claimed by appellees, which warranted the verdict of the jury in setting aside the will.

The record discloses that Maud Houston, at the time of the execution of the will, was a divorced woman, the widow of one Jules Bertrand, who also lived in the city of Houston. She was married to Bertrand on October 14, 1902, and they lived together in the city of Houston and at Seabrook as man and wife until some time during the year 1915, with the exception of a short period when Maud was in the city of Chicago; but some time during the year 1915 (the record not disclosing definitely the date) she and Bertrand separated, and thereafter she, up until a short time before her death, lived continuously in the city of Houston at the Bertrand home, where she had lived while cohabiting with Bertrand, and this character of separation continued until the 25th day of June, 1919, when a decree of divorce was granted them. Some time after that, about the 1st of November following, as best we can ascertain from the record, Maud Houston moved from the city to the town of Seabrook, and was living in her summer home at that place at the time her fatal sickness came upon her, and she then returned to the city of Houston.

Years ago, when Holmes was about 19 years of age, he met Maud Houston, who was then quite a young girl, in the city of Austin, and became acquainted with her, and while they were not sweethearts in those days, he at times kept in communication with her, and at periods more or less frequent met her. Holmes afterwards became a railroad man, and gradually worked himself up to the position of locomotive engineer, and some time about 1909 or 1910 he was put in charge of an engine that ran between the city of Houston and the city of Galveston, and this run he kept regularly until some time during the latter part of the year 1913. While on this run he would frequently meet Maud Houston (then Mrs. Bertrand) in the city of Houston, and sometimes such meetings would be prearranged, and sometimes not. During this period, however, Holmes never called upon Maud, then Mrs. Bertrand, at her home in Houston, but their meetings were elsewhere in the city, and he would accompany her to picture shows and other entertainments. Some time in the year 1915 (the record does not show just when) Holmes was taken off of his run between Houston and Galveston, and was put on an engine running between Temple and Somerville, and thereafter he had no occasion to be in the city of Houston in the discharge of any duties as engineer. The record shows, however, conclusively, that, not-

withstanding the change in his run, he continued to visit Houston on an average of once a week, usually on Sunday, from the time he was placed on the Temple and Somerville run up to the time of Maud Houston's death. On each of such visits he would meet Maud Houston; in fact, the purpose of his visits was to meet and be with her. Up to the time that his run was changed, as before stated, he had never, according to his own testimony in the case, had illicit relations with Maud Houston, then Mrs. Bertrand, any more than meeting her and attending shows, etc., as we have stated, and, as he said, sometimes he would kiss and hug her. One morning during 1915, however, according to his testimony, when he reached Houston and was having a conversation over the telephone with Maud Houston, then Mrs. Bertrand, she stated to him, substantially, that there was no reason why he should stay down town and pay hotel bills, because she said she had plenty of room out at her house, and that she was no longer living with Bertrand, and that Holmes might as well come out there and stay at her house. Holmes stated that, in response to this invitation, he then went out to Maud's house, and thereafter would go out there and stay when he would be on a visit to her in the city of Houston, and this continued practically up to the time of Maud Houston's death. Holmes admitted finally, on the trial below, that, after he commenced to visit Maud Houston at her home, as above stated, he did have illicit relations and, carnal intercourse with her regularly, but said that he knew and considered at that time that she was no longer living with Bertrand, and that Maud Houston had stated to him that she never expected to live with Bertrand again.

The record shows that Harry Holmes was a man of family, and lived with his family in the town of Temple during all the time he was meeting and associating with Maud Houston, his family consisting of his wife and three children, two of whom were of age in 1919, and the other was about 12 years old. Holmes testified that, for a number of years prior to Maud Houston's death, and especially after the year 1915, when the complete separation took place between her and Bertrand, he contributed largely and liberally to Maud Houston's support, furnished her money when she requested it, and also kept her in clothes and provided for her in any manner that she desired. He testified that the attachment between him and Maud Houston was such that he would do anything for her that she might ask, and he thought that she would do the same for him; that he could not and would not say that he loved her as a wife, but that he considered her a very dear friend of his, and she, according to her statements to him, looked upon him in the same way.

Up until December 3, 1919, Maud Houston, according to the undisputed facts in the record, was practically without means or property of any character except the Seabrook property, consisting of a lot and house and improvements thereon of the estimated value of $2,250, but, on December 3, 1919, a sister of hers who was Mrs. Lula Dallmyer, and who also lived in the city of Houston, died, leaving a will by which she devised and bequeathed to her sister Maud most of her property, estimated to be of the value of between $25,000 and $35,000. Mrs. Dallmyer, by her will, also left and bequeathed to Robert J. Houston $3,000. Outside of these two bequests the record disclosed nothing further concerning Mrs. Dallmyer's will.

We shall now notice some of the main facts relative to the execution of Maud Houston's will, just before and at the immediate time thereof. The proof in this case discloses, without contradiction, that Maud Houston, about a year or a year and a half before her death, became aware that her health was declining, and it seems that this continued gradually, and that about the latter part of November, 1919, her condition of health became serious, and she went to St. Joseph's Infirmary in the city of Houston for treatment. It was there that she first met Dr. Warren M. Wier, who, as we have shown, afterwards witnessed the execution of her will. Dr. Wier commenced treating her actively about the 25th or 26th of November, 1919, and continued his treatment until the morning of December 2, 1919, at which time he became convinced that there was little hope for her recovery, and on that morning, in the infirmary at Houston, he notified her of the seriousness of her condition. Dr. Wier was a witness on the trial of this cause below, and, with reference to the conversation between himself and Maud Houston, when he notified her of the seriousness of her condition, as just above shown, he testified:

"I asked her if she wanted any of her people notified, and told her that she ought to have some one with her besides her sister, as she was down at the time. So she told me that there were not any of her people that she cared for, and she requested me to send a telegram to Mr. Holmes. I sent the telegram myself. I wrote that telegram at Maud Houston's dictation, at her bedside at St. Joseph's Infirmary. I did write the exact words that she dictated to me. The telegram you hand me is the one I sent."

The telegram mentioned by Dr. Wier reads as follows:

"H. E. Holmes, Care Santa Fé Roundhouse, Somerville, Texas. Am sick at St. Joseph's Infirmary. You are needed.       Maud."

Dr. Wier, who, so far as this record discloses anything to the contrary, is a reputa-

ble physician in the city of Houston, and he testified, without any attempt at contradiction or refutation found in the record, that the above-mentioned telegram was written by him as dictated by Maud Houston, and that she made the statements to him, which as we have above shown; showed that Maud Houston did not want any of her relatives at her bedside, but that her only desire was that Holmes should be notified of her condition. Her sister Lula, Mrs. Dallmyer, was also in the infirmary at that time, contemplating, so far as we can judge from the record, a serious operation upon herself, and it was she to whom Dr. Wier referred in the above quoted portion of his testimony, when he told Maud Houston, substantially, that her sister was down and unable to wait on her.

Holmes received the telegram above shown some time in the evening of December 2d, and immediately sent a telegram stating in substance, that he would be in Houston as soon as he could reach there. According to the undisputed evidence, Holmes did reach Houston the following morning, December 3d, and, after getting a shave, went immediately to the infirmary to see Maud Houston. He testified upon the trial that when he first saw her he could not believe that she was as sick as the message to him would indicate, because, as he stated, from her physical appearance there was no serious illness and no great weakness of any kind that he could detect. He stated, however, that Dr. Wier seemed very serious and much concerned about Maud Houston's condition, and for that reason he made an appointment then and there with the doctor, before he left the infirmary, to meet him at the latter's office at noon for the purpose of ascertaining Maud Houston's real and true condition. He testified that he kept the appointment, and met the doctor, and asked him for Maud Houston's true condition. The reply of Dr. Wier was, in substance, that he had very little hope of Maud's recovery, whereupon Holmes asked the doctor, in substance, if any character of operation was necessary or would do any good, and that, if so, he was ready to bear the expense, and, in substance, he stated, according to his testimony to Dr. Wier that the latter should leave nothing undone that might be done to save Maud's life; that he (Holmes) was able and ready to bear any expense that was necessary or advisable with that end in view. Whereupon Dr. Wier replied that it might be possible that he would be able to "patch Maud up for a year or so." Holmes then returned to the infirmary, and was in constant attendance upon Maud, and was nursing and doing whatever he could for her.

On the same night (December 3d), about 11 or 12 o'clock, Mrs. Lula Dallmyer, Maud's sister, died in her room at the infirmary, leaving her will, which we have above mentioned, and which was dated November 25, 1919. After her sister Lula's death, according to the testimony of Holmes and that of Dr. Wier, Maud expressed a desire to be removed from the infirmary to apartments which had been occupied by her sister Lula prior to her coming to the infirmary. Holmes, according to his testimony, after being apprised of Maud's desire in this respect, asked Dr. Wier if it would be all right or advisable to remove Maud from the infirmary to such apartments, and, according to the undisputed evidence, Dr. Wier advised that there was no reason why she might not be removed, if she so desired, and consented, as the attending physician, to such removal. On Friday following, which was December 5th, Holmes had one of the undertaking concerns in the city of Houston to come to the infirmary with a conveyance and Maud was removed to her sister Lula's apartments, which were located at the corner of Congress avenue and San Jacinto street. These apartments consisted of some several rooms in the upper story of a brick building over a furniture house. They had been kept and occupied for several years, perhaps, by her sister Lula, prior to her death. On the same morning, but before Maud was removed from the sanitarium, Holmes hired an automobile and went after a negro woman whose name was Lucy Mayfield, for the purpose of having her go to Lula's apartments and do whatever was necessary in the way of airing and putting them in condition before removing Maud thereto. The negro woman consented and immediately went to such apartments and put them in shape before Maud reached there. On that same night, according to the undisputed evidence of Holmes, at the request of Maud Houston, he wrote and mailed to Mrs. Lucy E. Curry, at San Antonio, Tex., the following letter:

"Houston, Texas, 12/5/19.

"Dear Lucy and Sister: Just a few lines to ask you if you can arrange to come to me at once, for a week or ten days, as I am sick and in bed, and in very bad shape. Sis, I will pay your railroad fare and we can eat together; if you can arrange wire me and come as soon as possible, as I need you.

"Yours,                                    Maud.
"Miss Maud Houston, 303 San Jacinto Street, Houston, Texas."
(over)
"P. S.—Lucy: We buried Lula D. yesterday, died Wednesday night at 10:15 P. I have moved Maud from infirmary to Lula place.
"Yours,                                    Harry."

The record shows without dispute that Maud Houston very frequently called Mrs. Curry "sister" or "sis," which explains the word "sister" in the message, but in fact they were not related. This letter reached Mrs. Curry at San Antonio on Saturday, the day following, and, as quick as she could

make preparations to leave, she did so, and reached Houston on the following Sunday morning and went immediately to the apartments at the corner of Congress avenue and San Jacinto street, where she found Maud Houston attended at the time only by Harry Holmes. The undisputed evidence in the case shows that Mrs. Curry was an old acquaintance of Maud Houston's, they having become acquainted at Seabrook in 1912, where both families lived at that time, and Mrs. Curry testified that, during the time they were living at Seabrook, she saw Maud Houston, then Mrs. Bertrand, every day; that she afterwards lived about a year in the same house with Maud in the city of Houston, which was in 1916 and after the separation of Maud from her husband. She further testified, without contradiction, that from the moment she reached Maud's bedside she did everything she could possibly think of for Maud's comfort and benefit; that she herself was a practical nurse, and thought that she was thoroughly capable of administering to Maud's comfort and necessities.

At this time Maud was gradually getting weaker, and, according to Mrs. Curry's positive testimony, in the afternoon of December 9th, Maud Houston asked her to phone to Judge Blake Dupree, a practicing attorney in the city of Houston, to come to her apartments at once. Mrs. Curry could not remember whether Maud explained to her why she wanted Judge Dupree, but was very positive that Maud made the request of her, and that she complied by phoning to Judge Dupree, as requested. The uncontradicted testimony shows that, in a little while after getting the message, Judge Dupree responded and reached the apartments where Maud was confined, and when he came in there were present Mrs. Curry and Holmes. The record is not clear whether Dr. Wier was there at the time or not, but if he was not, he came a short while afterwards. Judge Dupree was a witness on the trial below, and testified positively and without contradiction that, when he reached Maud's bedside, she told him that she wanted him to prepare her will, and began to tell him how she wanted the will written, and thereupon he called for a tablet or scratch pad, or something upon which to make a written note of her wishes, and thereupon some one in the room, either Holmes or Mrs. Curry, handed Judge Dupree a scratch pad, and Maud began to tell him what she wanted to put in the will. Judge Dupree testified, and there was no attempt at contradiction, that he wrote on the scratch pad just what the terms of the will were to be, as dictated by Maud Houston herself, and that no one, neither Holmes nor Mrs. Curry, if either was present in the room at the time, about which he was not certain, said one word while Maud was telling him what to put in the will. Judge Dupree testified that Maud's mind at the time was perfectly clear,

and that she knew what she was doing, and dictated her will in a clear and straightforward manner. Dupree then left to go to his office, for the purpose of preparing the will, and dictated the will to his stenographer, and, as soon as it was typed, he returned with it, and, as prepared, read it to Maud Houston, and she stated, according to Dupree's uncontradicted testimony, that the will as prepared was exactly what she wanted. Dupree further testified that Maud then called for a pen with which to sign the will, and that a pen was handed her by some one, but whether it was Holmes or Mrs. Curry or Dr. Wier, who was then present, he was unable to remember.

According to his further testimony, Maud requested that she be raised up in the bed so that she might sign the will, and that Harry Holmes, in response to the request, put his arms around her or under her, and assisted her to a position where she might more conveniently use the pen in signing the will. He could not say exactly whether Holmes held her in his arms all the time she was signing the will, or whether he merely propped her up with pillows, or just what assistance Holmes furnished in that connection. He stated, however, that, after signing the will, Maud said to Holmes "Here, Harry, take this and put it in the bank." Both Judge Dupree and Dr. Wier, according to the undisputed testimony, signed the will as witnesses, at the request of Maud Houston. After that Judge Dupree took his departure from the premises. This was on the afternoon of December 9, 1919. After the will was given by Maud to Holmes, according to his testimony, he stepped into the bath room, and, in the presence of Mrs. Curry and Dr. Wier, read the will. He then put the will in a drawer and on the next day carried it and deposited it in a bank. Holmes swore, positively, that he never at any time in his life requested Maud Holmes to make a will in his favor, and that he never, on the occasion of the execution of the will, or at any time before that, even suggested to Maud what the terms of her will should be any further than that he did say to her, when she mentioned the fact to him that she was going to make a will and was going to leave him the greater part of her property and that she was not going to leave her relatives anything, that he then suggested to her that she ought to leave "Bob," meaning Robert J. Houston, her brother, as much as her sister Lula had left him, or, in other words, that she should be as liberal with "Bob" as Lula had been. He testified that Maud had told him that "Bob" had never been a brother to her, and that she did not intend to leave him anything, and that she had also theretofore told him that she would not leave her nephew, Clyde, anything, because of certain letters which he had written to her husband, Bertrand, while Clyde was with her in the city

of Chicago. Dr. Wier testified, in substance, that, at the immediate time of the execution of the will, he never heard a word said by anybody to Maud Houston or in her presence as to the terms of the will or what the will ought to be, and that after the will had been witnessed by himself and Judge Dupree, they departed together.

The undisputed evidence in the record in this case shows that the relations between Maud Houston and her brother Robert were not of that affectionate character that is usually found between brother and sister, and also the record shows, we think, without contradiction, that there was no feeling of affection between Maud and her nephew, Clyde Houston, at the time of the execution of the will. The record does not disclose when Maud Houston last saw her brother Robert or any member of his family, but it does disclose that the last letter, perhaps, that passed between any member of his family and Maud Houston was a letter to Maud Houston, which, according to the postmark on the envelope, was dated in 1912. According to the positive testimony of Holmes, Maud Houston had often talked to him about her lack of affection for her brother, Robert, and would always say that it was because her brother had not been a brother to her, and had not treated her right, and he further testified that Maud had told him on previous occasions that her brother, Robert, had even forbidden her niece, "little Maud," the daughter of Robert Houston, to visit or meet her Aunt Maud when she would be in the city of Houston, and not to go about with her.

The undisputed evidence in this record shows that, some time during the year 1913, while Maud Houston, then Mrs. Bertrand, was living with her husband at Seabrook, she became quite interested in what is commonly called Spiritualism, and that about that time a man by the name of Flockey came upon the scene at Seabrook, and this man was also much interested in Spiritualism. He and Mrs. Bertrand became intimate and friendly on account of their common interest in Spiritualism, and this continued, much to the annoyance and disgust of Mr. Bertrand, as is reflected by the record, and on June 2, 1914, Mrs. Bertrand, without the knowledge of her husband, eloped, so to speak, with this spiritualist, Flockey, and went to the city of Chicago, taking with them Maud's nephew, Clyde Houston, who was a boy at that time between 13 and 14 years of age. After they reached Chicago, it appears that Clyde was not satisfied with the situation, and in a few days wrote a letter back to Mr. Bertrand, in which he stated, in substance, that he was much dissatisfied and disgusted with the conduct of his Aunt Maud and Flockey, the "Dutchman," as he called him, and asked Bertrand for enough money to come back to Houston on. In about a week or ten days, Clyde wrote another letter to Bertrand, in which he repeated the disgusting conduct between his Aunt Maud and Flockey, and he stated that Flockey had about prevailed upon his Aunt Maud to go into the restaurant business in Chicago, and that his Aunt Maud was very much attached to Flockey, and that he was getting so disgusted that he could not stay there much longer, and that he would be bound to leave and go to work for himself unless he heard from Bertrand with money to go back home. Shortly afterwards he wrote a third letter to Bertrand, repeating everything that he had previously said relative to the conduct of his Aunt Maud and Flockey, and stated, substantially, that he had no love for either one of them, and cared nothing about them, and further stated, substantially, that Flockey was the cause of his Aunt Maud's leaving Bertrand, and advised Bertrand that he ought to get a divorce from his Aunt Maud.

In each of the letters mentioned Clyde admonished Bertrand to treat them with great secrecy and not to let anybody know that he had received such letters, but to keep them, and they might be valuable to Bertrand later on. The letters are lengthy, each of them, and it would be serving no useful purpose to incorporate them in this already lengthy opinion. Suffice it to say that these letters from Clyde Houston to Bertrand were such as to create a feeling of resentment, if not anger, on the part of his Aunt Maud. The undisputed proof shows that this boy, Clyde Houston, had been raised by his Aunt Maud in her home from almost infancy, and that she had treated him as she would have treated a child of her own. About the latter part of August, for some reason not explained by the record, Maud Houston left Chicago and came back to her husband at Seabrook, Tex., bringing with her her nephew Clyde. Just what took place between herself and husband immediately upon her return, the record does not disclose, but it is suggested by the record that Clyde Houston remained in the home of his Aunt Maud after the return, because the proof shows that later Clyde had a serious spell of sickness at Seabrook, and was confined to his bed for a considerable period, during which time his Aunt Maud attended him and nursed him, as she had ever done before. Whether or not his Aunt Maud at that time had learned of the contents of the letters which Clyde had written Bertrand, the record does not disclose. We are inclined to think, however, that it would be a reasonable deduction, from all the facts and circumstances, that Maud Houston did not learn of the contents of these letters until about the time of the divorce proceedings between herself and Bertrand, which, as we have shown, was not until June, 1919. It does appear from the record, however, that, after Maud Houston's death, Holmes found these letters from Clyde

Houston to Bertrand in Maud's safety deposit box in a bank in Houston, which is a circumstance showing that she intended to preserve these letters for some reason, and that she had not considered their contents lightly, notwithstanding the youthful age of Clyde at the time he wrote them.

[2] We said, near the beginning of this opinion, that one of the circumstances relied upon by the contestants in this case as tending to show undue influence in the execution of the will in question was the illicit relations between Holmes and Maud Houston. Let it be admitted, as it must be, that such relations existed for a considerable length of time. That, of itself, would not be sufficient to constitute undue influence in the execution of Maud Houston's will; ·and, so far as we have been informed, there is no law in this state, or rule of public policy, that would prohibit Maud Houston's will, as made, from being given full effect by the courts of this state, if, at the time she executed it, she was not lacking in testamentary capacity. Proof of such illicit relations between Holmes and the testatrix was admissible on the issue of undue influence, but only as a circumstance that might be considered along with other facts and circumstances, or other circumstances, in determining whether the will was the result of undue influence.

But, as we stated above, appellees further contend that the facts and circumstances in this case show that Holmes had, some time prior to the actual execution of the will, entertained the idea and purpose of securing for himself all of Maud Houston's property, and that this fact is a strong circumstance to show that Holmes, in keeping with such purpose and idea, did exercise some kind of control and undue influence upon her in the execution of the will at the time of its execution, especially in view of the fact that his opportunity for doing so was so great. This contention on the part of appellees is based upon the following facts:

W. S. Lemley, city attorney of the city of Temple, was a witness on the trial of this case, and testified, substantially, that, some time in the late summer or early fall of 1919, he met Holmes on the street in the city of Temple one day, and Holmes told him that he had a friend who wanted to make him a deed, and asked Lemley if he would draw the deed for him. Lemley replied that he would, and asked Holmes for a description of the property that was to be conveyed by the deed, whereupon Holmes stated to him that he didn't have the description of the property, and had not thought about the necessity of a description. He was informed by Lemley that the deed would have to describe the property, and thereupon Holmes told him that he would get the description the next time he went back to Houston. Lemley stated that he never heard any more from Holmes about the matter for some

three or four weeks, and that Holmes had waited so long that he had really forgotten about the matter, but about the 15th of November, 1919, he met Holmes again in Temple, and Holmes had an abstract or some other data showing a description of the property that was to be described in the deed, and handed it to Lemley with the request that, when the deed should be prepared, Lemley should mail it to Miss Maud Houston at Seabrook, Harris county, Tex. Lemley, two or three days later, did prepare a deed for Maud Houston to execute, in favor of Holmes, which described the Seabrook property, the only property of any value that Maud Houston owned at that time, and mailed the blank deed to Maud Houston at Seabrook. The deed was never, in fact, executed. When Holmes was on the stand as a witness, he was asked about this matter, and his explanation of it was substantially as follows: That along about the 1st of August, 1919, Maud Houston told him one day, while on a visit to her, that her health was not good, and that she felt that she was under obligations to him more than anybody else in the world, and considered him the best friend that she had in the world, and that she wanted him to have what little property she had at her death, and told him that she wanted to make him a deed to the Seabrook property, which was owned by her in her own right. Holmes testified, substantially, that he ridiculed the idea, and told Maud that she was under no obligations in the world to him, and that she owed him nothing, and that what he had done for her was because of his affection and friendship, and that he did not want her property, and that, besides, he had a place just like it at Seabrook, which the undisputed record shows was a fact, and that his place had always been a "darn nuisance," and that he really didn't want her property, and tried to persuade her from making him the deed. Maud, however, insisted, according to Holmes, that he should have his lawyer to prepare a deed from her to him for the Seabrook property, and he finally told her that he would do so, but, according to his testimony, he paid no further attention to the matter and forgot all about it until again, or perhaps several times thereafter, Maud Houston asked him if he had yet had the deed prepared, and each time he stated that he had not, and finally told her that he had spoken to a lawyer about it, and the lawyer told him that he would have to have a description of the property, and that therefore he had been unable to get the deed prepared, not knowing the description. He further testified that Maud then told him that she had the description, the abstract or deed or something from which he could get a description, in her trunk, and that she gave it to him and he took it, and, on his next trip after this, he handed the description to Mr. Lemley, from

which Mr. Lemley drew the deed; that afterwards, on a visit to Maud, she told him that she had not yet executed the deed (bringing the matter up herself), because she saw from the form of the deed that she had to acknowledge it before some notary public, and that she had not yet gone to see a notary public, and really did not know who one was, but told Holmes that she was going to attend to it right away.

This, of course, was all subsequent to the 17th of November, the date the blank deed bears, and the undisputed proof in this case shows that Maud Houston had gone to the infirmary for treatment as early as the 25th or 26th of November. If Holmes' testimony shall be given credence, relative to the drawing of this blank deed, it is reasonable to suppose that Maud would have executed it had she not been confined in the infirmary, but, as we stated above, the deed never was, in fact, executed by Maud Houston. There is this further explanation, however, concerning this contention of appellees: Judge Dupree testified, without contradiction, that, while he was taking notes on the scratch pad for the purpose of drawing Maud Houston's will, as we have before shown, this Seabrook property was mentioned (and as we have shown above it is also specifically mentioned in the will), and thereupon Maud Houston told Dupree that she thought she had already made a deed conveying that property to Holmes, but was not sure about it, and asked Judge Dupree if it would be all right to include the property in the will if she had, in fact, already executed the deed. Whereupon, Dupree stated to her that it would make no difference, so far as the legality of the will was concerned, and explained to her that it would pass by the will if she had not already deeded it to Holmes, and that, if she had already deeded it to him, it would hurt nothing to also put it in the will.

The above testimony of Holmes, as we have stated it substantially, and the positive and uncontradicted testimony of Judge Dupree, fully meets and destroys any effect or conclusion that might be drawn from Holmes' act in having Mr. Lemley to prepare said deed. In other words, if Holmes' testimony in this connection should be wholly disregarded, on the theory that he was an interested witness, yet the uncontradicted and positive testimony of Judge Dupree cannot be ignored. Therefore we say that there is nothing in the contention of appellees that there was shown to be any design or purpose on the part of Holmes to acquire Maud Houston's property.

Nor are we prepared to wholly agree with appellees' contention that Maud Houston's will, under all the facts and circumstances in this case, as we have tried to detail them, was an unnatural or unreasonable will. If it be true that there was no affection between her and her brother Robert and her nephew Clyde Houston, in other words, if this family did not feel towards each other as such relatives usually feel, and if for any reason her love and affection, friendship, or attachment for Holmes was greater than that for her brother and nephew, we cannot say that it was unnatural and unreasonable that she should prefer Holmes to such brother and nephew. There is not a scintilla of evidence in this record that her brother Robert or her nephew Clyde had ever contributed one penny to the support of Maud Houston, but, on the contrary, if such testimony as there was in that connection can be given credence (and such was uncontradicted), Robert Houston had ignored Maud Houston and had forbidden his daughter, "little Maud," to visit or meet his own sister and the aunt of "little Maud," for reasons presumably sufficient to him, and these facts were known and commented on by Maud Houston and furnish a reason and explanation why she was not more liberal to her brother Robert when she left him only $3,000 by her will.

As to Clyde Houston, who, as we have said, was raised by his Aunt Maud, and treated like a child of hers, the letters which he wrote to Bertrand, in which, as we have stated, he spoke in most disrespectful terms of her, and stated expressly that he had no love or respect for her, were calculated, we think, to arouse resentment in his aunt, and were sufficient as an explanation for her refusal to leave him anything by her will. Holmes testified in this connection, on the stand, that he told Maud Houston that she ought to leave Clyde something, when she told him that she wasn't going to leave him anything, and gave him the reasons why, and mentioned the letters he had written; that she told him that "if Clyde came crawling to her door on his knees she would not give him a crumb of bread." Of course, as appellees contend, it may not be true that Maud made such statement to Holmes, but if she did do so, it is conclusive that she was actuated by these letters breathing with disrespect and contempt for her, and it would be very natural and reasonable, we think, for her to entertain such resentment towards Clyde, to whom the undisputed record shows she had been a mother from his infancy, and this, we think, is true, notwithstanding her conduct, whatever it was, while in Chicago. And if it be true that Maud Houston refused to leave anything to Clyde, after Holmes advised or suggested that she should do so, then such refusal on her part would be rather a potent circumstance negativing undue influence on the part of Holmes over Maud Houston.

But leaving out of consideration the strained relations between Maud Houston and her brother Robert and her nephew Clyde, and looking at the situation from another standpoint, we cannot wholly agree with appellees

that the will was an unreasonable and unnatural one. If Holmes' testimony shall be given credence, for many years, and especially ever since the actual separation between Maud Houston and her husband, Bertrand, he contributed liberally to the support and maintenance of Maud Houston, furnished her with money, clothes, and such other assistance as she might desire, and, unquestionably, she entertained for him a greater affection, attachment, and feeling of friendship than she entertained for any other person on earth, and it would seem that it would not be unnatural for her to make him the principal beneficiary in her will, as she did. That he did largely contribute to her and practically support her, as he testified, is, we think, proven by other facts and circumstances in this record, aside from Holmes' testimony. As we have stated above, up to the time that her sister Lula died, which was but a few days before the will was made, Maud Houston had no means of support and had no property other than the Seabrook property, and Holmes was visiting her regularly, as he admitted, at least once a week, for the past several years, and it was but natural and reasonable that a man, under such circumstances and having such relations with a woman, was contributing to and perhaps wholly furnishing her support. Holmes, during such times, was drawing a liberal salary as a railroad engineer, the testimony showing, if we mistake not, that he was drawing a salary on an average of $320 a month. The record also shows that he was a man of some means outside of his salary. He owned property in the city of Temple, and also in the city of San Antonio, and perhaps at one or two other places, and we believe that all the facts and circumstances, and we cannot mention all of them as detailed by this record, corroborate Holmes' evidence to the effect that he was supporting and maintaining Maud Houston just as liberally as if he had been her lawful husband. If such was the fact, we cannot agree that her preference for him, as against her named relatives, was unreasonable or unnatural.

[3] But if it should be held, under all the facts and circumstances of this case, that Maud Houston's will was an unreasonable and an unnatural one, and even that it was an unjust will, still that fact of itself does not prove that it was the result of undue influence exercised by Holmes, and no judge or jury could set the will aside on that ground.

In Mayes v. Mayes (Tex. Civ. App.) 159 S. W. 919, an attack was made upon the will of J. J. Mayes on the grounds of lack of mental capacity, and also on the ground that the will was the result of undue influence exercised upon the testator by the principal beneficiary in the will, and among other things, it was contended by the contestants that the will was an unnatural, unusual, unreasonable, and unjust one. In disposing of such contention on appeal, the appellate court said, among other things:

"The will is an unusual one, and it appears to us, from what the evidence shows as to the relations between the deceased and his children and the conditions under which the property was acquired, that it was unnatural and unreasonable for the deceased to give all of his half of the property to his grandsons, and there is no reasonable explanation in the evidence of this disposition of the property; but this would not authorize the court to hold the will invalid. The [trial] court finds, and the uncontradicted evidence fully sustains the finding, that the deceased had testamentary capacity and that the will was read to him at the time he signed it and he knew his property and the objects of his bounty. The testimony of the witnesses to the will and all of those who knew of its execution shows that the deceased dictated the terms of the will without suggestion from any one, and that the disposition of his property made by the will was his voluntary act conceived in his own mind uninfluenced or unaided by the advice or suggestion of any one. If this is true, the fact that the will is unreasonable, unnatural, and unjust will not authorize the court to set it aside. The right of the owner of property to dispose of it by will to whomever he may choose is a valuable right which should not be denied because such disposition is not in accord with that which is generally regarded as natural, reasonable, and just. If, at the time the will is executed, the testator has the capacity to know and understand what he is doing, and his volition has not been subverted and overthrown by undue influence exerted over him by others, the disposition made by him of his property should stand, notwithstanding such disposition may appear unnatural, unreasonable, and unjust, and is without reasonable explanation."

See, also, Salinas v. Garcia (Tex. Civ. App.) 135 S. W. 591; Leahy v. Timon (Tex. Civ. App.) 204 S. W. 1029; Scott v. Townsend, 106 Tex. 322, 166 S. W. 1138.

As we have shown above, it is further contended by appellees that the provisions of the will are contrary to the intentions of Maud Houston, as previously expressed by her. To make this contention fully understood, a further statement of some of the facts becomes necessary. When Bertrand married Maud Houston in 1902, he was a widower with several children, one of whom was a daughter named Pearl. One of the witnesses in this case, a Mrs. Thompson, testified, substantially, that, while in company with Maud Houston in the city of Houston one day, the latter mentioned something to Mrs. Thompson about her Seabrook property, whereupon Mrs. Thompson stated, substantially, to Maud Houston that she hoped when the latter died she would leave the Seabrook home to her (Mrs. Thompson). Mrs. Thompson stated that this was only said by her jocularly, but that Maud Houston seemed to take it seriously, and thereupon stated to Mrs. Thompson that she had decided at that time to leave

the Seabrook property to Pearl Bertrand when she should die. The testimony further shows that Maud Houston had, on several occasions, expressed herself as being fond of Pearl, and for that matter, the testimony shows that she admired all of Mr. Bertrand's children. Then there is this further claimed fact by appellees in this connection: The negro woman, Lucy Mayfield, was also a witness on the trial, and, among other things, she said, substantially, that Maud Houston had told her, at some time not shown, that upon her death she would remember her. As a matter of fact, nothing was left by the will either to Pearl Bertrand or to Lucy Mayfield. These are all the facts, if we mistake not, upon which it is claimed that the will is contrary in its terms to the intentions of Maud Houston, as previously expressed.

[4] If it be true that she made these statements, and we will assume that they are true, yet the fact that she failed to keep such intentions by leaving the Seabrook property to Pearl Bertrand and remembering the negro woman in her will would not be sufficient to show that undue influence was exercised upon her at the time she executed the will. These facts were admissible as circumstances bearing upon that issue, but, like the other facts and circumstances we have mentioned, in the absence of something more cogent and of stronger probative force, showing that undue influence was exercised and that the will was the result of it, such circumstances would not be sufficient to set aside the will.

It is also contended in this connection that Maud Houston, notwithstanding the letters that had been written by Clyde Houston, had expressed and shown a kindly feeling and attachment for Clyde, and that she did regard and love him as her nephew, notwithstanding the letters he had written concerning her; and, in support of this contention, appellees call attention to a statement found in the record by one of the witnesses that on one occasion at least, while Clyde was in the army (after war was declared between the United States and Germany), one of the papers in Houston caried a notice of some act of bravery on the part of Clyde, and this witness, who was a lady and a neighbor of Maud Houston, saw the notice in the paper and showed it to Maud Houston, and that, upon seeing it, Maud Houston seemed to be affected and shed tears. Assuming that this testimony was true, it does not prove that Maud Houston had forgiven Clyde for his conduct in writing the letters concerning her above mentioned, nor is it at all certain that at that time Maud Houston had seen these letters. As we have stated before, the decree of divorce between Bertrand and his wife was in June, 1919, but there is nothing to indicate when she first saw these letters. We do not have to depend, however, upon mere suppositions as to what Maud's feelings towards Clyde were. We think that Clyde's own evidence shows that she felt unkindly toward him, and we quote from him as follows:

"I cannot say that I was either friendly or unfriendly with my Aunt Maud Houston, because, whenever she passed me, she wouldn't fully speak."

It does not appear from the record what time Clyde referred to in making the statement that his aunt, when she would pass him on the street, would not fully speak to him.

It is also contended by appellees that Maud Houston, although she had testamentary capacity at the time she made the will, nevertheless was a woman of weak mind and was easily influenced and that, such being true, there was much reason for indulging the presumption or drawing the conclusion that a jury might draw that Holmes influenced her in the execution of the will, and especially so, when his opportunity for doing so was so great at the time of the will's execution. if there is any testimony in this case, as reflected by the record before us, that shows that Maud Houston was a woman of weak mind and on account thereof was easily influenced, we have failed, after diligent effort, to find it. Mr. Bertrand, who was a witness in the case, and who was a party to the suit as next friend for Clyde Houston, did testify, substantially, that Maud was a woman of weak mind, but explained, in the same connection, what he meant by that statement. This explanation was that he considered her of weak mind because she became a Spiritualist and let Flockey make her do some foolish things unnecessary here to mention. And it was also in evidence that Maud Houston had an instrument called a ouija board that she used to consult. Aside from these matters, we repeat there was nothing indicating that Maud was a woman of weak mind or easily influenced. So far as Spiritualism is concerned, while she might have been influenced by some other Spiritualist, there is no contention that Holmes was a Spiritualist, but just the contrary, as shown by the record; nor was there any contention that Mrs. Curry was a Spiritualist, but the contrary is shown by the record. It is also shown that, for several years prior to Maud's death, she withdrew from the Spiritualist society as a member, but it is intimated that she did not entirely abandon her belief on that subject. One of appellees' own witnesses, Mrs. Gussie Farmer, clearly negatives the contention that Maud was a woman of weak mind. We quote from the witnesses in part as follows:

"I did state that I had known Maud Houston for 15 years; I know it must be nearly that long. I knew her long before she knew Mr. Flockey. Maud Houston was not a woman of a weak mind; she was very strong-minded. She always bragged about her Scotch mind, positive. She was a very quiet woman. She was not in the habit of flying off, and if she liked a person, she liked them, and if not, she didn't have anything in the world to do with them. She did

not appear to be weak-minded to me at the time she visited me during the last four or five or six weeks before she died. She never said much, but what she said was always to the point."

We have searched the entire statement of facts in this case diligently, and, aside from the fact that Maud Houston was a Spiritualist and the fact that she consulted a ouija board, there is nothing in the record to sustain the contention that she was of weak mind or that she was easily influenced.

Since the question of testamentary capacity is not in the case, the only material inquiry left was whether the will was the result of undue influence exercised by the proponent, Harry E. Holmes. There is certainly not a scintilla of evidence that Mrs. Curry exercised any undue influence.

In the case of Scott v. Townsend, 106 Tex. 322, 166 S. W. 1138, the Supreme Court of this state had occasion to define what is meant by the term "undue influence," as used in connection with a will contest, and, speaking through Chief Justice Phillips, the court, among other things, said:

"The law recognizes undue influence in the procurement of a will as a distinct ground for its avoidance. In its essential elements it has no real relation to the ground of mental incapacity. Testamentary incapacity implies the want of intelligent mental power, while undue influence bespeaks in itself the existence of a mind of strength sufficient to make a valid will if unhindered by the dominant influence, and such a mind as would have produced a valid will but for the coercion or restraint to which it was subjected. The issue is proved only when free agency is shown to have been supplanted, which means a testament made under such subjection or surrender of the natural freedom of will and action as that it speaks the mind of another. It is not necessary that the mind be reduced to a state of incapacity, for the invalidity of the will may then be established upon that ground alone. It is sufficient, though the mind be capable to the full extent that the law requires for testamentary capacity, if as a result of the exertion of the influence independence of volition be overcome, liberty to act subdued, and freedom of will be therefore subverted."

In Schouler on Wills, § 227, it is said:

"Undue influence is defined as that which compels the testator to do that which is against his will from fear, the desire of peace, or some feeling which he is unable to resist. We say that the influence must be undue in order to vitiate the instrument, because influence of one kind and another surround every rational being, and operate necessarily in determining the course of conduct under every relation of life."

In Patterson v. Lamb, 21 Tex. Civ. App. 512, 52 S. W. 98, the San Antonio Court of Civil Appeals, speaking through Justice Neill, among other things, said:

"Undue influence, legally speaking, must be such as in some measure destroys the free agency of the testator. It must be sufficient to prevent the exercise of that discretion which the law requires in relation to every testamentary disposition. It is not enough that the testator is persuaded by solicitation or argument from disposing of his property as he previously intended. He may yield to the persuasion of affection or attachment, and allow that sway to be exercised over his mind; and in neither of these cases would the law regard the influence as undue. To amount to this, it must be equivalent to moral coercion; it must constrain its subject to do what is against his will, but which from fear, the desire of peace, or some other feeling, he was unable to resist; and, when this is so, the act which is the result of that influence is vitiated. Gilbert v. Gilbert, 22 Ala. 529. In the absence of fraud, no matter what influence may be exercised on a testator, so long as it does not overpower his inclinations and judgment, and induce a disposition of his property contrary to his own wishes and desires, his will cannot be invalidated for undue influence. Monroe v. Barclay, 17 Ohio St. 302. The right of a testator to dispose of his estate depends neither on the justice of his prejudices nor soundness of his memory. He may do what he will with his own; and if there be no defect in his testamentary capacity; and no undue influence or fraud, the law gives effect to the will, though its provisions are unreasonable and unjust. Clapp v. Fullerton, 34 N. Y. 190; Jackson v. Jackson, 39 N. Y. 157. To avoid a will on the ground of undue influence, it must appear that the influence was exercised upon the very act of making the will. The fact that the testator was under the general, and even controlling, influence of another person in the conduct of his affairs, will not suffice to invalidate the will, unless that influence was specially exerted upon the testamentary act. Small v. Small, 4 Greenl. 220, 16 Am. Dec. 253, and authorities cited in note. Judge Redfield, after reviewing the cases decided, says: 'It is obvious that the influence to avoid a will must be such as, first, to destroy the freedom of the testator's will, and thus render his act obviously more the offspring of the will of others than of his; second, that it must be an influence specially directed towards the object of procuring a will in favor of particular parties; third, if any degree of free agency or capacity remained in the testator, so that, when left to himself, he was capable of making a valid will, then the influence which so controls him as to render his making a will of no effect must be such as was intended to mislead him to the extent of making a will essentially contrary to his duty, and it must have proved successful to some extent, certainly.' 1 Redf. Wills, 525."

For other authorities defining undue influence and showing the quantum of proof necessary to establish its existence, we refer to the following: Barry v. Garciette (Tex. Civ. App.) 71 S. W. 309; Leahy v. Timor, 110 Tex. 73, 215 S. W. 951; McFarland v. Ewing, 186 Ky. 829, 218 S. W. 271; Weta v. Schneider, 34 Tex. Civ. App. 201, 78 S. W. 394; Trezevant v. Rains (Tex. Civ. App.) 25 S. W. 1092; Peery v. Peery, 94 Tenn. 328, 29 S. W. 5; Egan v. Egan, 189 Ky. 332, 224

S. W. 1050; Drewry v. Armstrong (Tex. Civ. App.) 223 S. W. 281; In re Swartz, 79 Okl. 191, 192 Pac. 203, 16 A. L. R. 450.

[5] As we construe the above-mentioned authorities, before a testament may be annulled on the ground of undue influence on the part of a beneficiary over the testator, the evidence must be sufficient to show, with reasonable certainty, that such influence was exercised before the testament was made, and that it operated upon the mind of the testator at the time of the execution; that such influence, so far controlled and subverted the testator's mind and will power as to render him unable to resist it, and that, in consequence of such inability, the testament was made to reflect and express the mind and will of the beneficiary and not that of the testator. If the evidence falls short of this, the testament must be upheld. This is what is meant, we think, by the authorities which hold that before a will may be annulled on the ground of undue influence, the proof must show that, at the time of its execution, the testator was not a free agent, and that the testament expresses not his will, but that of another by which it was subverted and controlled. It is not meant, however, that, in order to warrant a finding of undue influence, the evidence must show that some overt act was committed, or that something was said by the person charged with having exercised such influence, right at the very time the testament was executed. For if such influence, in fact, had already been exercised, and was still operating upon and controlling the will power of the testator to the extent that he was not able to resist such influence, and while in such condition the testament was made, it would be void, and should be annulled. Rounds v. Coleman (Tex. Civ. App.) 214 S. W. 496; Pendell v. Apodaca (Tex. Civ. App.) 221 S. W. 682.

[6] The statement of facts in this case is rather voluminous, and, not being satisfied to accept the statements made by counsel in their briefs, we have read carefully the entire statement of facts, but after doing so we have not found one word of evidence showing or tending to show that either the appellant, Holmes, on Mrs. Lucy E. Curry ever at any time, by act or word, controlled or attempted to control the testatrix, Maud Houston, in her actions in any manner whatsoever. And our attention has not been called by counsel for appellees to any particular instance in which the mind or will of Maud Houston has ever been controlled by either of said beneficiaries, or that she was ever even asked to do or not to do a thing against her wish. We are not unmindful of the rule obtaining in all jurisdictions that undue influence, as that term is understood in connection with the execution of a testament, may be shown by circumstances. In the

very nature of things, that issue would have to be established by such evidence in most cases. In order, however, to establish the issue by such evidence, the circumstances relied upon must be so connected and of such probative force as to lead a well-guarded mind to a reasonable conclusion that such influence was exercised prior to the execution of the testament, and that it operated upon and controlled the will power of the testatrix at the time of its execution.

[7] As we construe the evidence in this case, relied upon by appellees to establish the issue of undue influence, it is wholly circumstantial, and we have stated above, in substance, the most material and cogent circumstances, as we consider them, that are relied upon to establish that issue. But, after considering such evidence in its entirety, and giving to it its strongest probative force, we have concluded that it falls far short of showing with any degree of certainty, that the will of Maud Houston in this case was the result of undue influence exercised upon her at any time by any person. And, although a jury has found to the contrary, and the trial court has permitted that verdict to stand, nevertheless this court is vested with authority, and it is made its duty by the statutory law of this state to reverse and set aside such verdicts and judgments when, in the opinion of this court, the evidence upon which they are based is wholly and manifestly insufficient to sustain them when measured by the rules of law that must govern.

In the case of Stolle v. Kanetzky, 238 S. W. 724, the Austin Court of Civil Appeals, speaking through Justice Jenkins, reversed for the third time a judgment of the trial court annulling a will on the grounds of lack of testamentary capacity and undue influence. Judge Jenkins said:

"We are loath to disturb the verdict of the jury upon issues of fact in any case, and especially so in this case, as there have been two verdicts in favor of appellee; but the evidence, both as to the insanity of Christian Stolle, and as to the undue influence of August Stolle, is so unsatisfactory that we feel we ought not to let the judgment * * * stand. Perhaps upon another trial one or the other of the parties to this suit may be able to produce more satisfactory evidence on the issues involved."

All appellate courts, no doubt, hesitate to reverse the verdict of a jury on a question of fact, yet, as we have said, such courts are not only clothed with that authority, but it is their legal duty, and they are expected to exercise it, when they are convinced that a verdict is overwhelmingly and manifestly against the evidence and is clearly wrong.

The able and energetic counsel for appellees in this case has cited and seems to rely largely upon the cases of Beadle v. McCrabb (Tex. Civ. App.) 199 S. W. 355, and Pendell

v. Apodaca (Tex. Civ. App.) 221 S. W. 682, as authorities in support of the jury's verdict in this case. We have read both of the cases very carefully, and have concluded that neither of them would authorize the upholding of the verdict in this case.

In the Beadle-McCrabb Case, the will of Mamie McReynolds was successfully contested in the trial court, and the sole beneficiary in the will, who was the appellant, Beadle, appealed from the judgment to the Court of Civil Appeals at Galveston, and judgment was there affirmed. But the facts in that case, relative to the issue of undue influence, were so clearly and greatly different from the facts in this case touching that issue that we are constrained to say that the facts in that case can have no relevancy to the facts here.

Mamie McReynolds was a woman living in the city of Houston and, at the time of her death, was about 46 years of age. Some 10 or 15 years before her death she met a man by the name of McNeely, and between them intimate relations commenced, and McNeely built for and gave to her a nice home in the city of Houston, of the value of approximately $20,000. McNeely's employment and duties during all the years of his relations with Mamie carried him away from the city of Houston, and he would only return there at stated periods, on an average of once a week or every two weeks, and when he would be in the city he stayed with Mamie in this home, and they lived and cohabited together for a number of years in this illicit way, McNeely supporting Mamie and keeping her as his mistress. About five years prior to her death, Mamie met Beadle, who also lived in the city of Houston, and was a man of family, consisting of a wife and several children. Beadle, soon after becoming acquainted with Mamie, wholly abandoned his family and home and went to live with Mamie at her home given her by McNeely, and the undisputed proof shows that illicit relations immediately commenced between Beadle and Mamie and continued during all the time that McNeely was not there, but when McNeely would go to Houston, Beadle would depart for the time being, but as soon as McNeely left Beadle would return and stay right there until McNeely came back. The undisputed proof shows that Beadle not only took charge of Mamie, but he took charge of all servants on the place, employed and discharged them, superintended and ordered the cooking of meals, and completely controlled and dominated Mamie and ran the entire premises. Before Beadle got in with Mamie, her sister, Mrs. McCrabb, who contested the will, visited Mamie regularly and often, and they were affectionate sisters. Mrs. McCrabb was a woman of small means, and Mamie frequently gave her presents and contributed at times to her support. It was not long after Beadle came on the scene that he began to object to Mrs. McCrabb's visiting Mamie, and finally told Mamie that her sister must stop coming to the premises. After that, the relations between Mamie and Mrs. McCrabb became changed, and finally one day Beadle forced Mamie to tell her sister that she must not come on the premises, and Mamie did so. Mrs. McCrabb was a witness in the case, and testified to these facts, and stated that Mamie explained to her how she hated to have to forbid her coming to see her, but that she was forced to do so by Beadle in order to keep peace in the "family."

Mrs. McCrabb further testified that Mamie told her on numbers of occasions, when she would happen to see her, of tyrannical and overbearing conduct on the part of Beadle, and testified, substantially, that on one occasion Mamie had told her that she would do anything to keep peace with Beadle, because he would quarrel and make life so miserable if she disobeyed him. Another woman visited Mamie at her home for a few weeks one time, a while before Mamie's death, and this woman testified that while there she observed that Beadle would not even permit Mamie to talk over the telephone unless he would also hold an attachment to the phone by means of which he was able to hear what Mamie was saying, and that Mamie did not attempt to talk over the phone without letting Beadle hear what she said. It was further shown in that case that McNeely had built in the yard for Mamie a very sightly and neat hot house— flower house—and that shortly after Beadle became boss of the premises, in the absence of McNeely, he insisted that Mamie have the house removed and placed elsewhere on the premises, stating that he did not like McNeely's taste in putting the hot house where he did. Mamie objected to this, but Beadle's will prevailed, and the hot house was moved, and Mamie told McNeely on his next visit that some expert flower man had advised her to remove the house, because the flowers would grow better in the new place. It was shown without dispute by servants in the house that Beadle stuck so close to Mamie that he would even follow her to the bathroom and stay with her until she came out, and that he even refused to permit her to go out into the city unless he accompanied her.

We could not, of course, be expected to detail here all the facts and circumstances in that case which went to show that Mamie McReynolds was under the absolute and complete control and domination of Beadle, the sole beneficiary of the will. There were dozens or more of specific instances shown by the uncontroverted evidence of such domination and control. Not only that, but the evidence in that case showed, without con-

tradiction, that Mamie McReynolds was affected with an unnatural sexual desire, and that this man Beadle took advantage of that fact and satisfied it in an unnatural way and to such extent that, according to the evidence of three reputable physicians of the city of Houston, it resulted, in their opinion, in completely overthrowing and subverting the will of Mamie McReynolds. And notwithstanding these charges against Beadle and showing him to be a man of the lowest and most degraded character, he did not appear as a witness in the case to deny any of them, though he was in the city of Houston when the case was tried. After Mamie's death, Beadle was found in possession of her will, whch he carried immediately after her death to his attorney. Under what circumstances the will was made nobody knew, but, as we have stated, Beadle was the sole beneficiary, and not a dollar was left to any one of Mamie's relatives, and, as the Galveston court remarked, strange to say not a dollar was left to McNeely, who had been her benefactor for years, and who had given her the palatial home which the will purported to give to Beadle. After mentioning these facts, and a number of others, the Galveston court finally concluded that the evidence was sufficient to show that Mamie Mc-Reynolds' will was executed under undue influence, but stated that the conclusion was not reached without some difficulty. It seems to us that the facts and circumstances in that case compelled the conclusion reached.

In Pendell v. Apodaca, the will of Sofia Apodaca was the subject of contest. By the provisions of the will everything was left to Pendell, with the exception of $1 to each of Sofia's brothers and sisters. The estate consisted of valuable property in the city of El Paso. The reason for the successful contest of the will in that case by the brothers and sisters will fully appear from what the court said, as follows:

"It is, of course, well settled that fraud and undue influence may be proved by circumstantial evidence, and there are strong circumstances in this case to indicate that undue influence was exercised, and also to strongly indicate that the testator did not, in fact know the contents of the paper when she signed it. First, five or six years' adulterous relationship; second, none of her brothers or sisters or other relatives ever heard her say anything about leaving her property to appellant, but testified that she asked them if it would be all right to leave him guardian of her property; third, the paper was drawn up at the dictation of appellant by his attorney; fourth, appellant present with his hired hand on the execution thereof; fifth, the paper not read by her nor fully read to her by the attorney; sixth, her physical condition at the time of its execution, she having died the second day thereafter, etc., are of the strongest probative force, and are un-

questionably sufficient to support the verdict of the jury."

We consider the facts in this case so entirely different and so much stronger on the issue of undue influence than are the facts in the instant case that the two can hardly be said to be to any extent similar. Indeed, the only real similarity between the two might be said to be the adulterous relations between the parties.

In this case the undisputed proof shows that Judge Dupree was a stranger to the appellant, Holmes, and, instead of being his attorney, that he was Maud Houston's attorney, and that he was called to her bedside by her order that she might dictate to him the terms of her will, which the undisputed testimony shows she did, and without interference or suggestion by any one while she was doing so; and the undisputed testimony further shows that the will was prepared just as she dictated it, and that it was read over to her, and that she stated that its provisions were "just what I want."

If the evidence of appellant in this case should be ignored in its entirety, yet the meager circumstances relied upon for annulling this will, over the uncontradicted and positive evidence of Judge Dupree and Dr. Warren M. Wier, entirely disinterested witnesses, are not sufficient to authorize any jury or court to ignore and set at naught the last will and testament of Maud Houston.

The judgment is reversed, and the cause remanded.