## SKEETERS et al. v. HODGES et al.[*]
### (No. 1192.)

(Court of Civil Appeals of Texas. Beaumont.
March 19, 1925. Rehearing Denied April
1, 1925.)

**I. Wills ⬅⟳324(3)—Evidence held not to raise issue of undue influence.**

In proceedings to probate will, evidence *held* not to raise issue of undue influence.

**2. Wills ⬅⟳316(3)—Refusal of requested issues on undue influence not erroneous where issue not raised by evidence.**

In proceedings to probate will, refusal of special issues submitting specific issues of fact as to undue influence *held* not erroneous, where such issue was not raised by evidence.

**3. Wills ⬅⟳316(3)—Refusal of requested issues on undue influence held not erroneous.**

In proceedings to probate will, refusal of special issues submitting specific issues of fact on undue influence *held* not erroneous, where such issue was raised, if at all, by all the evidence, and there was nothing to raise such specific issues of fact.

**4. Wills ⬅⟳316(3)—Refusal of special issues on undue influence held not erroneous in view of issue submitted.**

In proceedings to probate will, refusal of special issues submitting specific issues of fact on undue influence *held* not erroneous, as issue submitted in general terms fully presented contestants' case.

**5. Wills ⬅⟳400—Any error in refusing requested issues on undue influence held harmless.**

In proceedings to probate will, any error in refusing special issues on undue influence *held* harmless; in view of court rule 62a, where no other verdict rendered could have been sustained.

**6. Appeal and error ⬅⟳499(3)—Any error in denying cross-examination not presented for review where objections not stated in bills of exception.**

Any error in sustaining objections to cross-examination *held* not presented for review, where objections urged and sustained were not contained in bills of exception.

**7. Appeal and error ⬅⟳1048(6)—Any error in sustaining objections on cross-examination held harmless when facts before jury.**

Any error in sustaining objections to questions asked witnesses on cross-examination *held* harmless, where jury had before it all facts sought to be elicited by cross-examination, and it did not appear affirmatively that answers would have weakened witnesses' testimony before jury.

**8. Wills ⬅⟳292—Evidence that contestants were willing to be friendly with testatrix held properly excluded as irrelevant.**

In proceeding to probate will, evidence that contestants, who had estranged testatrix by litigation, were willing to be friendly with testatrix and offered their assistance, which she refused to receive, *held* properly excluded as being irrelevant.

**9. Wills ⬅⟳399—Exclusion of evidence held not presented for review.**

Exclusion of evidence in proceedings to probate will as to declaration of testatrix *held* not presented for review, where bill of exceptions did not state on what grounds evidence was excluded.

**10. Witnesses ⬅⟳140(9)—Witness' testimony held properly excluded where she was wife of one of litigants.**

In proceedings to probate will, witness' testimony as to a declaration of testatrix *held* properly excluded, in view of Rev. St. art. 3690, where she was wife of one of litigants.

**II. Wills ⬅⟳378—Evidence adduced on trial in probate court held admissible in proceedings to probate will.**

In proceedings to probate will, evidence of physician as adduced on trial in probate court *held* admissible on trial in district court, under Rev. St. art. 3275, where it was offered as a part of proceedings had in probate court mentioned in certificate of county clerk.

**12. Wills ⬅⟳284—Allegations as to settlement between proponent and contestants held properly stricken.**

In proceedings to probate will, contestants' allegations as to contract of settlement made by proponent with them *held* properly stricken, where all beneficiaries did not join therein, and, under terms of agreement, will was entitled to probate as to all beneficiaries except, signatories.

Appeal from District Court, Nacogdoches County; Ben F. Dent, Judge.

Proceedings by C. A. Hodges and others to probate the will of Mrs. Sallie E. Compton, opposed by W. T. Skeeters and others. Judgment for plaintiffs, and defendants appeal. Affirmed.

V. E. Middlebrook, of Nacogdoches, and Woods, King & John, of Houston, for appellants.

Hodges & Greve and S. M. Adams, all of Nacogdoches, for appellees.

WALKER, J. This is an appeal from a judgment of the district court of Nacogdoches county, admitting to probate the last will and testament of Mrs. Sallie E. Compton, who died November 28, 1923. The will, which was written wholly in the handwriting of the testatrix, was as follows:

"Sept. 24, 1923.

"Know all men by these presents: That I, Sallie E. Compton, of Appleby, Nacogdoches Co., Tex., considering the uncertainties of this life, and being of sound mind and memory, do make and declare this to be my last will and testament, hereby revoking all former wills.

"1st. I direct that all my just debts be paid.

"2nd. I give to my brother, W. T. Skeeters, one dollar.

---

"3rd. I give to my brother, John Skeeters, one dollar.

"4th. I give to my sister, Eliza Haney, one dollar.

"5th. I give to Macy Skeeters, the only child of my brother, Frank Skeeters, deceased, one dollar.

"6th. I give to the heirs of my deceased sister, Annie Haney, one dollar.

"7th. I give to my uncle, W. H. Tindall, of Garrison, Tex., five hundred dollars.

"8th. I give to Mr. & Mrs. B. L. Melton, of Lufkin, Texas, five hundred dollars.

"9th. I give to Mrs. Mollie Scoggins, five hundred dollars.

"10th. I give to Mrs. Nathan Wheler, five hundred dollars.

"11th. I give to Mr. & Mrs. Horace Hunt, five hundred dollars."

(The above is from page 1 of the will, and she signs it at the bottom of it.)

"Sallie E. Compton."

(The following is from page 2 of the will:)

"12th. I give to Mr. & Mrs. Willie Blackshear, five hundred dollars.

"13th. I give to my nephew, George Skeeters, five hundred dollars, to be paid to him by my executors, when he is 25 years of age, if living, if not living the same is to revert to my estate.

"14th. I give to Mrs. Agnes Morris of Brownsville, Tex., five hundred dollars.

"15th. I give to Mrs. Ola Tillery, five hundred dollars.

"16th. I hereby nominate & appoint as the sole executors of my estate, without bond, Attys. Chas. A. Hodges and J. J. Greve. For executing this trust they are to receive one thousand dollars ($1,000) each.

"17th. To my sister, Mrs. Alice Mixon, and her heirs, I give, devise and bequeath all of the residue of my estate, both real and personal, including household and kitchen furniture.

"18th. I desire no other action against this will, other than to probate the same.

"Sallie E. Compton."

The contestants are those of her brothers and sisters and other relatives to whom she left $1 each. The other beneficiaries in the will are named as contestees. The grounds of contest were (1) want of testamentary capacity on the part of the testatrix; (2) exercise of undue influence; (3) a contract signed by Mrs. Mixon, the principal beneficiary, by which she agreed not to probate the will. This contract was duly executed by Mrs. Mixon, but not by her husband, and the allegations affecting it were stricken out on demurrer.

The case was submitted to the jury on the following special issues, answered as indicated:

"Special Issue No. 1. Did Mrs. Sallie E. Compton, at the time she executed the will under consideration herein, bearing date of September 24th, 1923, have testamentary capacity as that term has been hereinabove defined?"

To this issue the jury answered: "Yes."

"Special Issue No. 2. Was the will executed by Mrs. Sallie E. Compton on the 24th day of September, 1923, or any bequest therein, procured through undue influence exercised upon Mrs. Sallie E. Compton by the legatees therein, or either of them, or by any other person or persons, as the term 'undue influence' is hereinbefore defined?"

To this issue the jury answered: "No."

"Special Issue No. 3. Did Sallie E. Compton execute the will on September 24th, 1923, and was she then under an insane delusion, as that term is hereinbefore defined, that her relatives named in the will, or either of them, other than her sister, Alice Mixon, bore ill will and hatred toward and sought to poison her, or had wrongfully undertaken to acquire her property, or any part thereof, cause and produced in her mind under facts and circumstances which no rational person would have believed?"

To this issue the jury answered: "No." In connection with these issues, and as a part of its charge, the court fully instructed the jury as to the law of the case.

The facts of the case are that Mrs. Compton was a most eccentric old lady, who had lived by herself in the town of Appleby many years before her death. In her youth she was a school teacher in that section of the state, afterwards moved to Oklahoma, where she married at the age of about 35 or 40 years, lived in Oklahoma until the death of her husband, and while there accumulated some very valuable property. Subsequent to 1908, at the request of her brothers and sisters, she returned to Appleby to make her home with their parents and to care for them and supervise their business, since they were old, owned considerable property, and were not able to take care of themselves. As Mrs. Compton had no children she continued making her home with her parents, looking after their business as well as her own until their death. The mother died in 1914, and the father in 1918. Then for a year or so, one or more of her nephews stayed with her in the old family home, but this arrangement did not last long, and after they left she continued living in the old family home alone until her death. Mrs. Compton was in charge of all the estate of her father and mother at the time of their death, and the children, other than Mrs. Mixon, not being satisfied with the settlement she proposed to make, instituted suit against her for partition of that estate. Mrs. Mixon was very friendly with Mrs. Compton in this dispute, and, refusing to join as plaintiff with her brothers and sisters, was joined by them as defendant. The case was tried, resulting in a verdict against Mrs. Compton, from which she appealed, and on appeal the case was reversed. See Compton v. Skeeters (Tex. Civ. App.) 250 S. W. 201, to which we refer for a full statement of the nature and result of that suit. No adjustment was ever made of the issues raised in that suit, and it was on the docket

of the district court of Nacogdoches county undisposed of at the time of Mrs. Compton's death. The plaintiffs in that suit made many charges against their sister, involving bad faith on her part, which resulted in deeply offending her, and for which she never forgave them. From the institution of that suit until her death, Mrs. Mixon's feelings towards Mrs. Compton are very well reflected in the following letter, written by her to Mrs. Compton on the 18th day of February, 1918:

"Sallie, you asked us for a little advice about papa's business. We don't like to meddle but Jim said tell you that your advice was alright and if you could not do otherwise for you to charge them up with more wages per month for nine years and 1½ months. Of course we all ought to no that you have earned it, and I think it is nothing but right that you should have pay for your trouble, and if Will don't do what is right, if I was you I would just charge the heirs up with so much, if I was you I would not let them beat me out of nine years hard work for you sure have earned it I know. I could not held out to do what you have. Now Sallie, I hope you will manage that business so that you will save yourself for you have earned it."

Mrs. Compton adopted the suggestions in that letter as to her defense against the suit instituted by her brothers and sisters. Her feelings towards Mrs. Mixon are very well reflected by the following letter written by her to Mr. B. L. Melton on September 20, 1922:

"Dear Friend Enclosed please find ck. for $10. to cover your expenses of attending court last Thursday & for your witness fee.—I shall remember you in a more substantial way when it is convenient for me to do so. I shall never forget the assistance you rendered me as I was being devoured by a band of conspirators.— Mrs. Mixon was the only one that was disposed to act white with me, as shown by a letter she wrote me just after father died, which letter I introduced at the trial. Mrs. Mixon was sick in bed & could not be present at the trial.—On account of her honesty and uprightness & after I was convinced of the same & that she never at any time claimed any interest in anything left at my parent's death, about 1½ years after the death of the last one I made Alice Mixon a present of $300.00                               (over) in gold that had belonged to our mother for 35 or 40 yrs.—and which was given to me when I came here & been in my possession ever since. Father died Jan. 15, 1918 & I gave Alice the $300 in gold on July the 10— 1919 & she signed a receipt which is still in my regular receipt book. Receipt is as follows: 'Received of Sallie E. Compton $300. in gold as a gift from her' I would be glad to hear from you. If you write—use plain envelope & mail it on the train. I'm mailing this on the train. That is why I did not write you sooner.—Jno. Weatherly is Postmaster & he opens every letter I get trying to pry into my business—Best wishes for you & yours—Always your friend          Sallie E. Compton.
"P. S.—I lost the case; but will appeal."

The friendly relations between these two sisters, revealed by these two letters, continued until the death of Mrs. Compton. Mrs. Mixon would visit her occasionally, two or three times a year, as shown by the record, until Mrs. Compton was advised by her physician in September, 1923, that it would be necessary for her to go to a hospital for treatment. She then sent for Mrs. Mixon, who remained with her, waiting on her and preparing her to go to the hospital, until she was carried away for treatment. During this time Mrs. Compton wrote the will involved in this suit, under the following circumstances:

On the day the will was written, she requested her sister, Mrs. Mixon, and another woman who was helping nurse her to bring to her sick room a law book, paper, pen, and ink, and when they had done this, she told them to leave the room, as she had some very important business to attend to, but did not advise them of the nature of the business, nor that she was preparing to write her will. Afterwards, on the same day, the other woman first returned to the room and removed the book and paper, etc. At that time, while Mrs. Compton was practically confined to her room, she was not confined to her bed, but was able to walk to her bathroom. While there was nothing said about a will at that time, the circumstances are possibly sufficient to raise an issue that Mrs. Mixon knew that her sister was writing a will; also, the evidence raised an issue that Mrs. Compton had written another will a short while before this time, but there was no evidence as to its contents, and if such a will was written, the evidence shows that Mrs. Compton destroyed it. The next day after writing her will, she sent for her attorney, Judge Hodges, conferred with him about her business, and exhibited her will to him. There is not in the entire record a single suggestion that Mrs. Mixon ever discussed with Mrs. Compton the question of a will, that she ever tried to influence her in any way as to her choice of beneficiaries, that she ever discussed their brothers and sisters with her, except as reflected in the letter above quoted, that she ever made any suggestion to her one way or the other that would in the least arouse a bias, prejudice of ill will in the heart of Mrs. Compton against her brothers and sisters, that she ever said anything to her sister to cause her to believe that her other brothers and sisters bore ill will and hatred toward her, or that they were undertaking to wrongfully acquire her property 'or any part thereof. Mrs. Compton remained in the hospital only a short time, and was then carried to the home of a friend in Appleby, where she re-

mained until her death. During this period Mrs. Mixon and her husband were both frequent visitors with Mrs. Compton, waiting upon her and ministering to her as called upon and as their sense of duty prompted. There is no suggestion ·that Mrs. Mixon, her husband, or any of the other beneficiaries undertook to discuss with Mrs. Compton any features of ·her business during this time. Mrs. Compton never became reconciled to her brothers and sisters who had sued her, but often, after the institution of the suit, was heard to say that she would not provide for them in her will. There is no evidence that she ever promised them or any one else to remember them in her will. She seemed to be afraid of them. The evidence showed that some of them at one time sent her some food for her table, and that she was afraid they had poisoned it. As we understand from the record, there was, for many years prior to the death of Mrs. Compton, an open, avowed purpose by her to disinherit her brothers and sisters, except Mrs. Mixon, and there was not the least evidence that she ever changed this purpose or ever expressed to any one any other purpose. Also, we would say there is not a scintilla of evidence in the record making Mrs. Mixon or her husband, or any of the other beneficiaries, responsible for this fixed purpose in the heart of Mrs. Compton. We do not give the evidence on the issue of "want of testamentary capacity," since appellants concede that the verdict of the jury on this issue is sustained by the evidence. But we will say that the evidence showed that Mrs. Compton was a woman of much ability during her active life; that is, was strong-willed and managed her business on her own initiative. While often seeking advice, the decision in her business policies were her own. She continued conducting her business up until her death, leaving an estate of the probable value of $60,000.

### Opinion.

Appellants' first proposition is as follows:

"If a testatrix is importuned to disinherit a natural object of the testator's bounty, and led by the importunity, based on unfounded representations to make a will that would not have been made but for the importunity, the will is tainted by undue influence, and is not the will of the testatrix."

[1] There is no merit in this proposition as applied to the facts of this case. After carefully considering the will, and fully examining all the testimony quoted by both parties in their briefs, it is the deliberate judgment of this court that there was not even a scintilla of evidence raising the issue of undue influence, and that it should not have been submitted to the jury. We have concluded, as stated above, that there was no evidence that any one "importuned the

testatrix to disinherit" the contestants, nor was there any evidence that she was "led by the importunity, based on unfounded representations, to make a will that would not have been made but for the importunity." No importunities of any kind were shown. Appellants quote as follows from Johnson's Adm'r v. Johnson, 45 S. W. 457, a Kentucky case:

"The testimony is sufficient, perhaps, to establish the capacity of testatrix to dispose of her property by will, if she had been left to determine the matter for herself; but there is sufficient proof of malicious and improper efforts on the part of the devisees of this will to unduly influence her mind, towards the close of her life, when she had become weakened by physical infirmities, to justify the court in submitting this question to the jury. Certainly there can be no better method of exercising such influence than by persistently making statements, the effect of which was to revive and keep alive in the mind of testatrix the memory of imaginary wrongs."

We readily concur in this statement of law, but in the case before us there was no evidence of "malicious and improper efforts on the part of the devisees of this will to unduly influence her mind," nor is there a suggestion of evidence, "the effect of which was to revive and keep alive in the mind of testatrix the memory of imaginary wrongs." In fact the evidence is all to the contrary; that is, there was no evidence at all on those issues. Until just a few days before this will was written, Mrs. Mixon had not been in the habit of visiting the testatrix more than two or three times a year.

Again, appellants make this extensive quotation from Gallagher v. Neilon (Tex. Civ. App.) 121 S. W. 567:

"And that Jim and Martin Neilon were very active in procuring the execution of said will and codicil, and probably unduly influenced the testator in making the disposition of his property as therein appears, may reasonably be inferred from his extreme old age, mental weakness, deep distress and anguish at the rapid approach of the death of his wife, the importunities and zeal with which the execution of ·said will was procured, and the unexplained virtual disinheritance of his daughters and grandchildren, for each of whom the testimony clearly indicates he entertained sincere affection. James Neilon, Sr., when the will was written and signed, was, as the testimony shows, between 83 and 87 years of age. His memory was so defective that he would forget statements made and acts done by him in a very few minutes afterwards. ·He was so grieved and heartbroken over the condition of his wife 'that he didn't seem to care for anything.' In this condition and amid these sad and distressing surroundings we find his son Jim Neilon engaging him in conversation relative to the preparation and execution of his will, admonishing him that he had already given Ed Neilon more than any of the rest of his children, and that Ed, his trusted son, was not the proper person to 'fix the business,'

but that his (Jim Neilon's) stepson, V. B. Gallagher, the proponent herein, was. Immediately after this conversation, and while awaiting for V. B. Gallagher to come to prepare the will, it appears that Martin Neilon engages his father, when no one else was present, in a long talk, which is immediately followed by the preparation of the will in question. The daughters of the testator, who had theretofore been the recipients of his love and bounty, in the will were given 'a mere pittance' —$400 apiece. So unequal was the distribution made by the will of the testator's property, and so out of keeping with the affection evinced for his daughters and his former kind and considerate treatment of them, that we feel justified in saying it was unnatural and inequitable."

In that case there was evidence of "deep distress and anguish at the rapid approach of the death of the wife" or testator, his memory was defective, and "he didn't seem to care for anything." Here the very reverse is the case. While Mrs. Compton was sick, very sick, she was fully conscious of what she was doing, and wrote this will in her own handwriting. In that case the testator entertained a "sincere affection" for the disinherited children. Here Mrs. Compton was deeply offended at her brothers and sisters, and had been for many years. There the testator's son, Jim Neilon, engaged him in conversation relative to the preparation of a will, "admonishing him that he had already given Ed Neilon more than any of the rest of his children, and that he was not 'a proper person to fix the business,' but that his (Jim Neilon's) stepson" was. Here we find 'no such importunity. There was no suggestion that any one of the beneficiaries recalled the old trouble, advised as to the will, warned her as to any of her brothers and sisters, or made any suggestion as to the will or its provisions. In that case the daughters of the testator, who had theretofore been the recipients of his love and bounty, were given in the will "a mere pittance." Here these contestants had not been the recipients of either love or bounty of the testatrix for several years before her death. In that case, on its facts, the court said:

"So unequal was the distribution made by the will of the testator's property, and so out of keeping with the affection evinced for his daughters and his former kind and considerate treatment of them, that we feel justified in saying it was unnatural and inequitable."

Can that be said of this will on the facts of this record? We do not think so. The will only carried out the expressed intentions of Mrs. Compton during several years. She had not shown any disposition to be friendly with the contestants; she had shown no special kindness towards them; she thought she had a grievance against them, and often expressed it. They had sued her, making charges which impeached her honor and in-

tegrity, which she resented, and which she never forgave. The sister she remembered had been kind and loving to her during this period. We should say that the record shows a most satisfactory reason for all the other bequests made to the strangers to her blood.

We recognize that it is difficult to prove undue influence by direct evidence, and that often it can be proved only by circumstances, as in the cases cited, supra. Opportunity, importunity, an unnatural will, one not in accordance with an opinion expressed at the time, a solicitude for the disinherited relatives, previous contributions toward their support—many circumstances may enter into a case, but such circumstances can only have such weight as may be given them by the attending facts. Here every circumstance usually relied upon and now relied upon by appellants has been so satisfactorily explained in keeping with the purpose and intent of the will that they have no probative force whatever towards its destruction. After reviewing many of the authorities in this state, and based on those authorities, announcing the legal principles controlling the issue of undue influence the Chief Justice of this court said in Holmes v. Houston, 241 S. W. 1039:

"We are not unmindful of the rule obtaining in all jurisdictions that undue influence, as that term is understood in connection with the execution of a testament, may be shown by circumstances. In the very nature of things, that issue would have to be established by such evidence in most cases. In order, however, to establish the issue by such evidence, the circumstances relied upon must be so connected and of such probative force as to lead a well-guarded mind to a reasonable conclusion that such influence was exercised prior to the execution of the testament, and that it operated upon and controlled the will power of the testatrix at the time of its execution."

[2] After excepting to the issues as submitted on the ground that they embodied mixed questions of law and fact, were too broad and general, and did not submit the issue of "undue influence" in an affirmative way as raised by the pleadings and evidence, etc., appellants requested, in lieu of the issue as submitted, on "undue influence" the following questions:

"Did the beneficiaries named in the will before you, or either of them, by act, statement, word, or conduct, prior to the execution of such will, lead and cause Sallie E. Compton to believe that her relatives named in the will, or either of them, other than her sister, Alice Mixon, bore ill will and hatred toward her?

"Did the beneficiaries named in the will before you, or either of them, by act, statement, word, or conduct, prior to the execution of such will, lead and cause Sallie E. Compton to believe that her relatives named in the will, or either of them, other than her sister, Alice Mixon, were undertaking to wrongfully acquire her properties or any part thereof?

"Did Sallie E. Compton execute the will in evidence before you under such belief and because thereof?

"Did the relatives of Sallie E. Compton, named in the will or either of them, other than her sister, Alice Mixon, bear ill will and hatred towards her prior to the execution of the will before you?

"Had the relatives of Sallie E. Compton, named in the will, or either of them, other than her sister, Alice Mixon, undertaken to wrongfully acquire her properties, or any part thereof, prior to the execution of the will before you?"

Each of these special requested charges was refused by the trial judge. Under authority of Fox v. Dallas Hotel Co., 111 Tex. 461, 240 S. W. 517, appellants submit the following proposition based on the overruling of their exceptions by the court and his refusal to submit their requested issues:

"A group of facts provable under the pleadings which, if proven, constitute a complete defense on the ground of undue influence should, on the request of the contestants, have been submitted to the jury; and it was not sufficient over contestants' objection to submit the issue of undue influence in general terms."

[3-5] Error was not committed by the court in the giving of the special issue in the main charge and the refusal of appellants' requested issues, for the following reasons:

(1) As we have already said, the issue of "undue influence" was not raised by the evidence.

(2) If such an issue was raised it was raised by all the evidence, and in our judgment there was nothing to raise the specific issues of fact submitted by the questions requested.

(3) Recognizing fully the force of the argument of the Supreme Court in the Fox Case, as to the manner of submitting special issues, conclusions in which we are in hearty accord, not only because they are by the Supreme Court, but because we believe they are sound in principle, we cannot say that the manner of submission of this case was error. The requested issues 3 and 4 submitted facts as specially pleaded, but though submitted in the form of two questions, in effect, the appellants have requested their submission as only one group of facts, both of which must have been found by the jury against appellees before question No. 5 could be answered intelligently in favor of appellants, since question No. 5 was predicated on the facts as submitted in questions 3 and 4. There was, therefore, no confusion growing out of different groups of facts. If "undue influence," under appellants' requested issues was in the case, it must rest on the specific questions requested. In connection with its issue of "undue influence," the court charged the jury as follows:

"(3) By undue influence, as used with respect to the execution of the will, is meant any means employed upon or with the testatrix under which the circumstances and conditions by which the testatrix was surrounded, she could not well resist, and which controlled her volition and induced her to do what she would not otherwise have done. This influence must operate at the time of the execution of the will and be of such power as to supplant the free agency of the testatrix, and result in the execution of a will which does not represent the wishes of the testatrix, but which represents the wishes of the person or persons exercising the influence.

"(4) The issues in this case may be established by circumstantial evidence and you will consider this character of evidence along with other evidence in this case.

"(5) You are instructed in regard to undue influence that it is not necessary that the overt act of influence, if any, were exercised at the very time of the execution of the will, but it is sufficient if it be shown that such influence, if any, over the mind of the testatrix had been prevously exercised and operated at the time of the making of the will in the disposition of the property."

We think that the issue as submitted, when understood in the light of the charge given by the court, was an affirmative presentation of appellants' case as fully as they would have had in the manner requested by them.

(4) But if error was committed, on the facts of this case, it is immaterial error under rule 62A, since no other verdict than the one returned could have been sustained.

Under their third proposition, appellants complain that they were denied the right to fully cross-examine the witnesses G. L. Davidson, Mrs. Compton's banker, and Dr. G. E. Samuel, her physician. This proposition is based on the following bills of exception:

"Bill of Exception No. 2. Be it remembered that upon the trial of the above-entitled and numbered cause, and after proponents had introduced the witness, G. L. Davidson, and had proven by him that as cashier of the bank at Appleby, he was acquainted with Sallie E. Compton and had been for some several years, and that she had an account at said bank, and that he had had frequent business transactions with her covering a period of time down to the day she left for the sanitarium, and that he had always found her capable of intelligently attending to her own affairs, and that, in his opinion, she was very intelligent, and that he had never noticed anything to indicate that there was any trouble with her mind, and after said witness was turned over to contestants for cross-examination, contestants during the course of said cross-examination propounded to the said witness, the following questions:

"(1) Do you know of any other lady of her age who persisted in living alone without any one with her day or night?

"(2) Haven't you heard it discussed that a woman with that much money who would dress as she did was peculiar?

"(3) You have observed that she dressed far under the standard to what you thought her situation in life would justify, hadn't you?

"(4) She was eccentric, wasn't she?

"(5) Do you know what general reputation she sustained in the community as being a peculiar and eccentric individual?

"(6) Did she not sustain the general reputation of being a peculiar and eccentric individual?

"(7) Would you not consider that it was strange and peculiar that a woman of her means and of her age would insist on so living?

"And that as each question was propounded, the proponents objected and the court sustained proponents' objection to each of said questions as and when propounded, and would not permit said witness to answer either of said questions, which said witness would have answered had be been permitted by the court to answer said questions as follows:

"(1) To the first question he would have answered that he did not know and had never heard of any other lady of the age of Sallie E. Compton persist and insist on living alone without any one in the house with her day or night.

"(2) To the second question he would have answered that he had heard it discussed in the neighborhood where Sallie E. Compton lived that a woman with as much money as she had who would dress as she did when going out in company was very peculiar.

"(3) To the third question he would have answered that he had observed that she dressed very shabby and far under the standard to what he thought her situation in life would justify.

"(4) To the fourth question he would have answered that from his observation and dealing with her, he considered that she was a very eccentric individual.

"(5) To the fifth question he would have answered that he was acquainted with the general reputation which Sallie E. Compton sustained in the community where he had lived for the past several years as being a peculiar and eccentric individual.

"(6) To the sixth question he would have answered that she did sustain the general reputation in the community as being a very peculiar and eccentric individual.

"(7) To the seventh question he would have answered that he did consider that it was strange and peculiar that a woman of the means of Sallie E. Compton and her age would insist on living as she did.

"And contestants as each ruling of the court was made, when each of said questions were propounded, objected, and excepted to the rulings of the court for the reason that the same unduly limited and restricted contestants in the cross-examination of proponents' witness Davidson, and but for which contestants would have elicited testimony favorable to their contention from proponents' witness, and, therefore, the action of the court in so limiting such cross-examination and refusing contestants the benefit of the testimony the witness would have given in answer to such questions, was an undue and unwarranted abuse of the court's discretion in controlling the cross-examination of said witness, and the contestants now here tender this their bill of exceptions No. 2 to such action of the court, and ask that the same be signed and approved and filed as a part of

270 S.W.—58

the record in this cause, which is accordingly done.

"Bill of Exception No. 2 is approved with the following qualification: Witness answered question as follows:

"I would say that she likely had peculiarities, and I expect I testified to that before.

"In answer to the question, 'Don't you know that she had peculiarities?' the witness answered, 'I know I have; I would say that she had some peculiar ways.'

"At the time of the contestants asking the above the court stated to the contestants' counsel that he might state anything that he saw or knew, but not the witness' opinion."

"Ben F. Dent, Judge Presiding."

"Bill of Exception No. 11. Be it remembered that upon the trial of the above-entitled and numbered cause, and after contestants had shown on cross-examination by proponents' witness, Dr. G. E. Samuels, that he knew of Mrs. Sallie E. Compton's hiding in a closet of her house some time prior to the execution of the will, and that her relative and neighbors were searching the premises, and that afterwards she stated that she had hid in the closet in the house and was there while they were searching the house, and that the reason she had done so was to keep from accommodating William Tindall; that she knew he was in town and would want to borrow some money, and that she wanted to get away from him, contestants propounded to the said witness, who had been introduced as a physician and expert by proponents, and who had on direct examination testified that he waited upon her during her last illness and had known her for years, and that she was an intelligent, capable woman, and that her mind was good, the following question, to wit:

"'You don't find normal people doing those things often do you, Doctor?' But the court sustained proponents' objection to said question, and refused to permit said witness to answer said question to which action of the court contestants then and there excepted for the reason that such action of the court was an undue limitation of the cross-examination of said witness, and was an abuse of the court's discretion in the control of the cross-examination, and refused contestants the benefit of his answer thereto, which would have been that such act was not the act of a normal individual, and contestants here now present this their bill of exceptions No. 11 to such action of the court, and ask that the same be signed and approved and filed as a part of the record in this cause, which is accordingly done.

"Examined, approved, and ordered filed this 27th day of August, 1924.

"Ben F. Dent, Judge Presiding."

[6] These bills show no error, for the following reasons: (1) While appellants state in their bills that appellees objected to their questions and the court sustained such objections, they do not state the objections urged and sustained. In an unbroken line of decisions, this has been held necessary. Railway Co. v. Jones (Tex. Civ. App.) 60 S. W. 978; Carlton v. Conkrite (Tex. Civ. App.) 249 S. W. 522; Lumber Co. v. Railway Co., 106 Tex. 12, 155 S. W. 178; Mercedes Prod-

uce Co. v. Roddy (Tex. Civ. App.) 249 S. W. 249; Hall v. Ray (Tex. Civ. App.) 179 S. W. 1135; Railway Co. v. Jarrell, 38 Tex. Civ. App. 425, 86 S. W. 632; White v. Bell (Tex. Civ. App.) 242 S. W. 1086; Foster v. Burgin (Tex. Civ. App.) 244 S. W. 244; Cunningham v. Holt, 12 Tex. Civ. App. 150, 33 S. W. 981; Met. Life Ins. Co. v. Gibbs, 34 Tex. Civ. App. 131, 78 S. W. 398; Railway Co. v. Wishert (Tex. Civ. App.) 89 S. W. 460; Jenkins v. Morgan (Tex. Civ. App.) 187 S. W. 1091; Bank v. Smith (Tex. Civ. App.) 160 S. W. 313; Wilkins v. Railway Co. (Tex. Civ. App.) 260 S. W. 215; Citizens' Garage Co. v. Wilson (Tex. Civ. App.) 252 S. W. 187; Witherspoon v. Cory (Tex. Civ. App.) 250 S. W. 199; Bank v. Powell (Tex. Civ. App.) 149 S. W. 1096; Walker v. Railway Co., 51 Tex. Civ. App. 391, 112 S. W. 430. In Carlton v. Conkrite, 249 S. W. 522, this court said:

"There is but one bill of exception in the record in connection with the ruling of the court rejecting the evidence tendered by appellant, and this bill wholly fails to show the grounds of objection that were interposed by appellee to the tendered evidence, and for that reason the bill fails to show error in the trial court's ruling. It is, of course, elementary that rulings of the trial court admitting or rejecting evidence, where such rulings are objected to and would be complained of in the appellate court, must be reflected by bills of exception in order to have reviewed the action of the trial court.

"The rule in this state is equally well settled that a bill of exception to the ruling of the trial court sustaining objections to evidence tendered by a party must show the grounds of such objections, and failing to do so, the bill points out no error."

It is not sufficient that the complaining party state his exceptions to the court's ruling in such an instance, as appellants do in their bill to the exclusion of the evidence of Mr. Davidson, but they must set out the exception which the court sustained. The bill must show on what ground the offered evidence was excluded, and since these bills do not do that, they are fatally defective.

[7] (2) Without controversy, it appears from this record that Mrs. Compton was eccentric, did not live in a normal way; that is, as people usually live, and therefore the jury fully had before it all the facts which the appellants sought to elicit from this proffered testimony. It does not affirmatively appear that the answers which appellants sought to elicit from these witnesses would have weakened their testimony before the jury.

[8] Under their fourth proposition, appellants complain of the refusal of the court to admit certain evidence, to the effect that they sought to have Mrs. Compton change her method of living, that they wanted to help her, but that she would not accept any help, the general effect of which was to show that they were willing to be friends with Mrs. Compton, tendered their friendship and offered their assistance, but she refused to receive them. We do not see that this testimony was relevant to any issue in the case. Appellants had instituted unpleasant litigation against Mrs. Compton, which she resented, and which they never abandoned. The fact that they were willing to take her into their homes, or offered to do so, or remonstrated with her against her method of living, could not affect or explain, in the interest of appellants, Mrs. Compton's feelings towards them.

[9, 10] Under their fifth proposition, appellants complain of the exclusion of the testimony offered by Mrs. John Skeeters, wife of contestant John Skeeters, to the effect Mrs. Compton stated to her:

"That J. R. Mixon, husband of the contestee Alice Mixon, had told her that W. T. Skeeters had offered to assist in preparing any papers which she desired prepared looking to the collection of the insurance policies, and that she had declined to let him have anything to do with it, and that Mr. Mixon had advised that all W. T. Skeeters wanted was to get possession of the policies so as to beat her out of the same."

The bill of exception complaining of the exclusion of this evidence is defective for the reason above given, in that it does not state upon what grounds the evidence was excluded, but only that "proponents objected to said testimony, and the court thereupon sustained said objection." But the evidence was not admissible. Mrs. Skeeters, being the wife of one of the litigants, was disqualified as a witness under article 3690, Revised Civil Statutes. Leahy et al. v. Tinon, 110 Tex. 82, 215 S. W. 951.

[11] Appellants' sixth proposition is as follows:

"When a witness is available for oral testimony, in open court, subject to cross-examination, it is seriously prejudicial error for the court to admit in evidence, over the objection of the party against whom the evidence is offered, a purported transcript of the witness' testimony on another hearing which does not comply with the requirements of any statute or rule of law making a transcript of evidence admissible, the evidence reflected by such transcript being on a vital issue in the case on which the other evidence was highly conflicting."

Under authority of article 3273:

"All testimony taken in open court upon the hearing of an application to probate a will shall be committed to writing at the time it is taken and subscribed in open court by the witness or witnesses, and filed by the clerk,"

—and article 3275:

"A certified copy of such record of testimony may be read in evidence on the trial

of the same matter in any other court when taken there by appeal or otherwise,"

—Revised Civil Statutes, the trial court permitted appellees to reproduce the evidence of Drs. W. C. Howard and W. P. Fears, as adduced upon the trial in the probate court, over their general objections, that it was agreed:

"That the witness, Dr. W. C. Howard, resides in the county of Nacogdoches, and is within the jurisdiction of the court, and was in attendance upon the court as a witness Monday of the week the trial begun, and who had agreed to return in person on 30 minutes' notice, and was then within the jurisdiction of the court, and could be had in person, as a witness; and further because the testimony as given in the probate court was given in a formal way, and there was no agreement that the testimony so given could serve or be used as a deposition, and the same was not taken under the forms or regulations for taking depositions to be used instead of the witness in person; and for the further reason that no excuse was shown for the nonpersonal attendance of the witness, Dr. W. C. Howard, and contestants had the right to have the witness testify in person in order that they might be afforded the opportunity to cross-examine said witness in the light of the facts developed upon this trial and testified to by witnesses herein, since the testimony of the witness Howard was given in the probate court; and further because the testimony offered does not embody the questions and answers as propounded, but is in the narrative form as prepared by the stenographer taking the same; and for the further reason that the jury trying this case is entitled to see and observe the demeanor and conduct of the witness offered by the proponents in order to correctly pass upon the credulity of the witness; and for the further reason that this trial in the district court is a trial de novo, the same as if there had been no trial in the probate court; and for the further reason that the purported testimony of the witness offered is not properly identified or certified to be the testimony and the words as given by the witness in the probate court; and does not bear the original signature of the witness, and the certificate of the county clerk does not sufficiently identify or certify to the correctness of the purported testimony of the witness, Dr. W. C. Howard, given in the probate court, and there is nothing to show that the testimony offered is in fact the testimony given by said witness in the probate court, and the same does not purport to be a certified copy of said testimony as contemplated by article 3275 of the Revised Statutes; and further because the provisions of said article was intended to permit a certified copy of testimony given by witness in the probate court only when said witness was not available to testify in person; and for the further reason there is nothing shown in the certificate that the purported testimony offered was signed and subscribed to by the witness in the open probate court, or that the same was filed by the clerk, and further because the purported testimony does not show, as it is offered, that it is a certified copy as contemplated by article 3275 of the

Revised Statutes. In making said objections, and as a part thereof, counsel for contestants stated to the court that in the hearing in the county court where the will was offered for probate, it was agreed that the stenographer taking the testimony would transcribe same, and that the witness might return and sign and swear to the same without then waiting on the time required for the stenographer to transcribe the testimony, but contestants state that it was not contemplated by such agreement that the statutory requirements that the testimony should be transcribed and sworn to in open court was waived, but that the agreement contemplated that the witnesses would return before the adjournment of the court, and subscribe and swear to the testimony in open court as required by the statute, and that the certificate of the clerk does not disclose that such was done."

The same objection was urged to the testimony of Dr. Fears. The evidence of these doctors as received was material evidence in the trial of this case, and was introduced under the following certificate:

"I, J. F. Perritte, clerk of the county court in and for Nacogdoches county, Texas, do hereby certify that the foregoing forty-six pages is a true and correct copy of all the proceedings had in the matter of the estate of Mrs. Sallie E. Compton, deceased, together with a true bill of costs accrued in this court.

"To certify which I hereunto sign my name and attach the seal of the county court at Nacogdoches, this the 20th day of February, A. D. 1924. [Signed] J. F. Perritte, Clerk County Court, By Susie Massey, Deputy."

We believe this evidence was admissible under article 3275, supra. No form of certificate for the evidence offered in the probate court is prescribed by the statute, and since the evidence offered was a part of the "foregoing forty-six pages" mentioned in the certificate of the county clerk, we think it comes within the provisions of the article cited.

[12] By the seventh proposition, appellants complain of the action of the court in striking out their allegations as to the contract of settlement made by Mrs. Mixon with appellants. This was not error. All the beneficiaries did not join in the execution of the agreement, but only Mrs. Mixon and Mrs. Lula Wheler. Even under the terms of the agreement, the will was entitled to probate, at least as to all the beneficiaries except Mrs. Mixon and Mrs. Wheler. The courts have recognized the principle that an agreement by all the parties interested in a will that they will take as heirs at law of the deceased, and not under the will, destroys its legal effect, and that thereafter the will has no legal existence in conferring rights upon the legatees. Phillips v. Phillips, 8 Watts (Pa.) 197; Stringfellow v. Early, 15 Tex. Civ. App. 597, 40 S. W. 871. But in the cases cited the contract was to annul the will as a whole. In this case, the effort is to annul

only some special provisions thereof. In Prather, v. McClelland, 76 Tex. 574, 13 S. W. 543, it was held that a proceeding to annul certain provisions of a will must be after the will is probated. The court's ruling in sustaining the demurrer to appellants' petition, thereby striking out the allegations as to the contract entered into by Mrs. Mixon, annulling the provisions of the will in so far as it affected her, is in all things sustained, however, without prejudice to any further proceedings that they may institute in this behalf.

Finding no errors in the record, it is our order that the judgment of the trial court be and the same is hereby in all things affirmed.