## KOLB v. CHANDLER et al.

No. 2629.

Court of Civil Appeals of Texas. Eastland.

March 12, 1948.

Rehearing Denied April 2, 1948.

Blanton & Blanton, of Albany, and Scarborough, Yates, Scarborough & Black of Abilene, for appellant.

Wagstaff, Harwell, Wagstaff & Alvis, of Abilene, for appellees.

LONG, Justice.

This is a will contest. Andrew J. Kolb instituted this suit against Emmette Chandler, Independent Executor under the will of Pearle D. Newton, and Hendrick Memorial Hospital, sole beneficiary thereunder, to set aside the will and the probate thereof on the grounds that testatrix did not possess testamentary capacity and that same was executed under undue influence. The trial court submitted the cause to a jury upon the two following issues:

"Question No. 1: Do you find from a preponderance of the evidence that, at the time Mrs. Pearle D. Newton executed the instrument offered in evidence in this case, as her will, she acted under the undue influence of Emmette Chandler and Earl M. Collier, or either of them, as the term 'Undue Influence' is hereinafter defined?

"Answer: 'She did act under undue influence' or 'She did not act under undue influence'.

"Answer ——

"By the term 'Undue Influence' is meant such influence or domination, as exercised at the time, which destroys the free agency of the person making the will and overcomes her wishes in regard to the disposition of her property to such an extent that the will does not in fact express her wishes as to the disposition of her property, but those of the person or persons exercising the influence.

"Question No. 2: Do you find from a preponderance of the evidence that, at the time Mrs. Pearle D. Newton signed the instrument offered in evidence as her last will, she did not have testamentary capacity, as that term is hereinafter defined?

Answer: 'She did have' or 'She did not have'.

"Answer: (Yes) She did have."

The jury answered issue No. 2 in the affirmative but failed to agree upon issue No. 1. At the conclusion of the evidence defendants filed a motion for an instructed verdict on the ground, among others, that the evidence did not raise the issue of undue influence. The trial court received the verdict of the jury with only issue No. 2 answered and rendered judgment based thereon in favor of the defendants. The judgment recites that it is immaterial that the jury did not answer question No. 1 and finds that there was no evidence in the record from which the jury could have found that the testatrix, at the time she executed her will, acted under undue influence and that issue No. 1 should not have been submitted to the jury. From the judgment plaintiff has duly appealed.

Plaintiff in various ways challenges the action of the court in rendering judgment for the defendants in the absence of a finding on undue influence. The question presented is, does the evidence raise the issue of undue influence.

The defendant, Emmette Chandler, and the testatrix, Pearle D. Newton, lived in the same community in Runnels County when they were children and attended the same school. In 1895 the Chandler family moved to Abilene. Thereafter, in April 1898, testatrix came to Abilene, stayed in the Chandler home and attended school. She later married Mr. Newton, at which time they moved to Louisiana where Mr. Newton died in 1928. After his death, testatrix returned to Abilene to live. They had no children. Both the father and mother of testatrix died many years ago. They had no children other than Mrs. Newton. The defendant, Emmette Chandler, was a business man in Abilene, engaged in the general insurance business.

In May, 1945, testatrix called Mr. Chandler on the telephone and advised him that she wanted to discuss a matter with him and asked him if he would come to her home. The same afternoon he went to the home of testatrix in Abilene. With reference to what occurred between Mr. Chandler and testatrix, we quote as follows from the testimony of Mr. Chandler:

"A. She said, 'Emmette, this thing on my neck is a cancer. I don't know whether you knew that or not, but it is eventually going to take me out, and I have this home here and I been thinking that I would want to leave it to some worthy institution and I had thought of an orphanage and I wanted to see what you thought about it or if you thought of some other worthy institution that I could leave it to', and I says, 'Well, now Pearle to be frank about it, you are going to have to spend your last days in a hospital and why wouldn't it be better for me to talk to George Anderson, who is Chairman of the Board at the Hospital and see if we can't make arrangements for you to go out there, and them take on this property?'

"Q. All right. Did she owe any money at that time? A. Yes. She said she owed about $500.00 on the house.

"Q. Secured by mortgage on the house? A. Yes, sir. And she told me, Judge, that there was no one else who was interested in this property but her; she had accumulated this property of hers and she was the only one interested in it.

"Q. Did she ever say anything to you about her relatives in connection with a will? A. Nothing other than she said 'I have a step brother and step sister in Pennsylvania.'

"Q. Did she tell you at any time whether or not you were to notify any of her people who lived away from here? A. Yes, sir.

"Q. In case of her death? A. She told me not to.

"Q. Why did she say for you not to or did she say? A. Well, she seemed to be afraid that—

"Mr. Scarborough: Just a minute.

"The Court: Sustain the objection.

"Q. By Mr. Harwell: Just what she said? A. She says, 'I don't have anyone that would contest anything that I did with my property unless it would be this step brother and step sister in Pennsylvania and they don't have any right to say what I shall do with it.'

"Q. All right; now, about how long did you stay out there at her home that first afternoon, when she called you out there? A. I must have been there two or three hours.

"Q. When you suggested that you take the question up with George Anderson—who is George Anderson? A. He was the Chairman of the Board of Trustees of the Hospital.

"Q. Of the Hendrick Memorial Hospital? A. Yes, sir.

"Q. He lives here in Abilene? A. Yes.

"Q. When you suggested that to her then what did she say? A. She said 'Well, I wish you would, if it is not too much trouble'.

"Q. All right; then did you see George Anderson? A. I went to him the next morning, and told him what she had told me.

"Q. Did he do anything or did he send you somewhere? A. He said, 'Well Emmette, Mr. Collier—'

"Mr. Scarborough: We object to that, your Honor.

"The Court: Sustain the objection.

"Q. By Mr. Harwell: I did not ask you what he said. Did he send you to anybody? A. He sent me to Mr. Collier of the hospital.

"Q. That's Mr. E. M. Collier? A. Yes, sir.

"Q. Did you go to Mr. Collier then? A. I did.

"Q. Did you talk to Mr. Collier concerning what you and Mrs. Newton had mentioned that evening before? A. Yes, sir.

"Q. Did you communicate to Mr. Collier what Mrs. Newton had told you? A. I did.

"Q. What day was that with reference to the day that you first went out there? A. That was the next day.

"Q. Was Mr. Collier interested, for the hospital? A. Yes, sir. He was.

"Q. To talk with her? A. He was.

"Q. Then, what did you do? A. I came back and told Mrs. Newton that—

"Q. Did you tell her what he had said? A. I did.

"Q. And what happened then? A. She said she would be glad to go into the matter with him.

"Q. All right; then, what did you do? A. I went back to the office and called Mr. Collier and told him what she had said.

"Q. Did you arrange a conference? A. I did.

"Q. Between Mr. Collier and Mrs. Newton? A. I did.

"Q. When was the conference? A. I believe it was that afternoon, Judge.

"Q. All right; did you and Mr. Collier then go out to her home? A. We did.

"Q. And did you introduce Mr. Collier to her? A. I did.

"Q. Did he know her at that time. A. I don't recall that he said that he did.

"Q. Anyway, you made him acquainted with her? A. Yes, sir.

"Q. And did you make it known that he was with the hospital? A. I did.

"Mr. Blanton: We haven't objected to leading questions, but from now on, we ask that he not lead the witness.

"The Court: All right; don't lead the witness.

"Q. By Mr. Harwell: Was there any conversation then had between Mr. Collier and Mrs. Newton that day? A. There was.

"Q. Can you state in substance what the conversation was? A. He explained—

"Q. Can you state in substance what it was; just answer yes or no. Can you state in substance what it was? A. Yes.

"Q. All right. What was said between them? A. She says, 'I have been'—I don't know that I could repeat her words, Judge, but in substance it was that—she had this property and she had been thinking about what she would do with it; and it had been suggested to her that she leave it to the hospital. He explained to her the three plans by which she could leave it to the hospital and she could go out to the hospital and stay and come back and forth to her home.

"Q. And then would the property or not belong to the hospital after her death? A. It would.

"Q. You recall what those three plans were? A. Well, annuities and then that she could will the property to the hospital and I don't just recall just what the other one was.

"Q. Well, did she say whether or not she would do that? A. She said,—well—yes, she said she would.

"Q. That is, she would do one or the other; did she say which one she would do? A. She said she wanted to keep her property as long as she lived under her control but it would eventually go to the hospital.

"Q. All right; did Mr. Collier and you then leave? A. Yes, sir.

"Q. By the way, do you know whether the mortgage was mentioned that afternoon or not? A. It was.

"Q. Did she tell him anything about the mortgage? A. She did.

"Q. You remember about what she said? A. She said that she owed this mortgage of around five hundred dollars on the place.

"Q. Anything else she said, about the mortgage? A. I don't recall anything right now, Judge.

"Q. All right. Now, about when was that? A. That Mr. Collier and I were down there?

"Q. Yes, sir. A. I am pretty sure it was that afternoon.

"Q. About what date was it? A. Oh, I don't know what the date was.

"Q. Do you know approximately? A. It was in May.

"Q. What year? A. 1945.

"Q. 1945? A. Yes, sir.

"Q. All right; did you go back to see her after that date? A. The next day.

"Q. Did Mr. Collier go with you? A. No, sir.

"Q. And did you and Mrs. Newton discuss that question further, when you went back? A. We did.

"Q. You remember what she said? A. She said that she thought that was a good idea, and that was what she was going to do.

"Q. That is, one of those plans with the hospital? A. That's right.

"Q. And she was going to do one of them? A. Yes, sir.

"Q. Did she tell you which one she was going to do? A. Yes, She thought that she would leave her property to the hospital but that she would take these treatments and go out there when it was necessary.

"Q. By the way, when you and Mr. Collier went to see her was she up or was she in bed? A. She was up.

"Q. You had known her a long time? A. Yes, sir.

"Q. In your opinion did she know exactly what she was doing? A. Oh, yes.

"Q. And then, when you went back the next day was she up? A. Yes.

"Q. And in your opinion did she know exactly what she was doing? A. She did.

"Q. Did you go back any more to see her before she went out to the Hospital? A. I did.

"Q. How many times? A. I don't know how many times, Judge. Several times though.

"Q. And did you discuss this proposition, that is, the question of the hospital proposition and the property with her at different times? A. Yes, I did.

"Q. Did she ever change her mind as to what she was going to do? A. She never did."

Thereafter, on June 13, 1945, testatrix entered Hendrick Memorial Hospital as a patient and remained therein until her death on October 14, 1945. In August, 1945, she requested Mr. Collier to get in touch with Honorable E. L. Harwell, an attorney in Abilene and ask him to come to the hospital for the purpose of drawing her will. Mr. Collier contacted Mr. Harwell and requested him to come to the hospital for that purpose. Following such request, he did go to the hospital and conferred with the testatrix. Thereafter, on August 15, 1945, testatrix requested Mr. Collier to have Dr. W. V. Ramsey, her physician, and one of the nurses to come to her room

for the purpose of witnessing the execution of her will. Mr. Collier contacted Dr. Ramsey and Mrs. Odom, the X-Ray technician, and requested them to go to the room of the testatrix to witness her will. They complied with this request and the testatrix executed her will which was witnessed by Dr. Ramsey and Mrs. Odom. The evidence is conflicting on whether Mr. Collier was present at the time of the execution of the will, but the jury would have been authorized in finding that he was present when the will was executed. In two or three days after the execution of the will, Mr. Chandler went to the hospital for the purpose of visiting the testatrix and she asked him to get her purse out of the closet in the room which he did and handed it to her and from the purse she removed an instrument in writing and advised Mr. Chandler that it was her will and she requested him to take it to his office and keep it until the proper time. Under the terms of the will, defendant Emmette Chandler was made independent executor without bond and all of the property belonging to the testatrix was bequeathed to Hendrick Memorial Hospital.

Plaintiff Andrew J. Kolb, 91 years of age, was the uncle of testatrix. He alleged in his petition that he was the sole and only heir of testatrix. He lived with his daughter at Ennis, in Ellis County. He formerly lived near testatrix in Runnels County but moved away fifty years prior to the trial of this case. It is shown by the testimony of Mrs. Winterrowd, daughter of Mr. Kolb, that her father received a card from testatrix at Christmas time 1944, and that the same was signed, "love from Pearle D. Newton." Mrs. Winterrowd further testified that in the spring of 1945 her father received a letter from testatrix in which she asked him to come to Abilene and live with her.

Walter W. Pettitte, a witness for plaintiff, testified that he had known testatrix for thirty-five years; that she was a close friend of his wife. He further testified that in a conversation with her several years prior to her death that she told him that she wanted to leave her property to her uncle and her cousin, Champ Freeman,

and at which time she asked him to act as the executor of her will, but that he refused.

The appraised value of the estate of testatrix is $10,494.48. The total indebtedness against the estate as shown by the inventory and appraisement, was $2,375.28, leaving a net value of the estate of $8,119.-20.

The evidence shows that testatrix had been suffering with a cancer on her face or neck for some time prior to the execution of her will. She had been under treatment of doctors in Fort Worth and Houston. She had received several deep therapy treatments at Hendrick Memorial Hospital covering a period from April, 1943 until December, 1944. It is further shown that she was administered narcotics and sedatives to some extent during the time she was in the hospital from June, 1945 until the time of her death.

■ Counsel for plaintiff in their brief, direct our attention to certain discrepancies in the testimony of Mr. Collier and Mr. Chandler. There is a great deal of testimony in the record from both of these witnesses on cross examination as to whether Mrs. Newton told them at the time of the first conversation that they had with her about leaving her property to the hospital; as to whether she said she was going to leave "something to the hospital" or all of her property to the hospital. The statement of facts in this case is very voluminous, however, we have carefully read all of the testimony offered and endeavored to view the same in the light most favorable to the plaintiff, disregarding all adverse testimony, together with the claimed discrepancies in the testimony of Mr. Collier and Mr. Chandler. It would cause this opinion to be unnecessarily long if we should attempt to set out, even briefly, all of the evidence in the record. After a careful consideration, we are of the opinion that the issue of undue influence was not raised by the evidence.

■ "A propounded instrument is not to be rejected merely on proof that its execution or provisions were in some measure influenced or controlled by another person than the decedent. Conduct which requires

a denial of probate of the writing is that which is shown to have overcome the decedent's will or free agency." 44 Tex.Jur., page 565, Sec. 24.

"All the authorities agree that the issue of undue influence is proved only when the free agency of the testator is supplanted; that is, that the will is made under such suggestion or surrender of the natural freedom of will and action as that it speaks the mind of another. It is not enough that the testator is persuaded by solicitation or argument from disposing of his or her property as he or she previously intended; it must amount to moral coercion. Scott v. Townsend, 106 Tex. 322, 166 S.W. 1138; Ater v. Moore, Tex.Civ.App., 231 S.W. 457; Holmes v. Houston, Tex.Civ.App., 241 S.W. 1039; Wetz v. Schneider, 34 Tex.Civ.App. 201, 78 S.W. 394; Patterson v. Lamb, 21 Tex.Civ.App. 512, 52 S.W. 98, and the many cases and authorities there used without stating them here, a clear and comprehensive statement of the law as we view it, and in which it is held that to avoid a will on the ground of undue influence, it must appear that the influence was exercised upon the very act of making the will; that the fact that the testator was under the general and even controlling influence of another person in the conduct of his affiairs will not suffice to invalidate the will, unless that influence was specially exerted upon the testamentary act." Whitney v. Murrie, Tex.Civ.App., 264 S.W. 270, 273.

It is shown from the record that Emmette Chandler had no connection in any capacity with Hendrick Memorial Hospital. He did not go to the testatrix for the purpose of inducing her to make a will. He went to her home at her request and when he arrived, she advised him of her physical condition and told him at that time that she was contemplating making a will and leaving her property to some charitable institution. His action thereafter in contacting the officer of Hendrick Memorial Hospital was done at her request.

It is shown that Hendrick Memorial Hospital is a non-profit organization and that it operates a large hospital in the city of Abilene under the auspices of the Baptist Church. The testatrix was a faithful member of the South Side Baptist Church of Abilene and had been for many years. Before she went to the hospital, she called Reverend Ashford, her pastor, and had him come to her house at which time she advised him that she was going to leave her property to the hospital, and asked his advise about leaving her property in charge of Mr. Chandler. He told her that Mr. Chandler was a good man but he refused to advise her as to what she should do with her property.

It is not shown that Mr. Collier, the Administrator of the hospital, ever talked to Mrs. Newton about the kind of will that she should make, save and except the one time that he talked to her in her home with Mr. Chandler. It is not shown that he ever discussed the matter with her at any time after she entered the hospital. Furthermore, there is no showing that the will, as made by Mrs. Newton, was an unnatural will. She had no close relatives. She lived alone and so far as it is shown in this record, none of her relatives visited her to any extent. She had an incurable disease and in the very nature of things, as time went on and the disease progressed, she would, in all probability, become helpless and need the care and attention of a physician and of nurses.

It seems to us that the will, as made by her, was a natural will. Before she talked to Mr. Chandler, she had made a decision to leave her property to some charitable institution. Taking that in connection with the fact that she had an incurable disease and was soon to be in need of medical and nursing care, that it was a natural thing for her to give her property to the hospital that was sponsored by her church and that she, in turn, could spend her last days therein and have the very best medical and nursing care available. Without some showing that Mr. Chandler was acting in connivance with the hospital in obtaining this will, he having no connection with the hospital, it is apparent that the will could not be set aside on the ground that Mrs. Newton had been unduly influenced by Mr. Chandler in the execution thereof.

790

"The false statements must have been made to the testatrix by the beneficiaries under the will, or through their procurement or agency. They cannot be held responsible for the unauthorized statement of anyone, no matter how closely connected by ties of blood or marriage." Wetz et al. v. Schneider et al., 34 Tex.Civ.App. 201, 78 S.W. 394, 397.

Further, there is no showing that Mr. Collier influenced Mrs. Newton in making her will and all that is shown is that he had the opportunity to do so. Such a showing is not sufficient, under the law.

"Undue influence cannot be presumed or inferred from opportunity or interest, but must be proved to have been exercised, and exercised in relation to the will itself, and not merely in other transactions." Patterson v. Lamb, 21 Tex.Civ.App. 512, 52 S.W. 98; McIntosh v. Moore, 22 Tex. Civ.App. 22, 53 S.W. 611."

It is our opinion that the trial court did not err in rendering judgment for the defendants in the absence of a finding upon the issue of undue influence.

By points 1, 2, 3, 4, 5 and 6, plaintiff complains of the action of the trial court in sustaining certain special exceptions to his pleadings. We have examined those portions of the pleadings that were stricken by the trial court and although there may have been parts of the pleadings that were proper and that exceptions thereto should not have been sustained, yet upon an examination of the statement of facts, we find that plaintiff was allowed to prove or attempt to prove practically all of the allegations contained in his pleadings to which exceptions were sustained. It is our belief that no injury is shown to have been done plaintiff by reason of the action of the trial court in sustaining such objections, therefore, reversible error is not presented by these points and the same are overruled.

By point 17 plaintiff complains of the action of the trial court in sustaining an objection to certain testimony of the witness Walter Pettitte. Mr. Pettitte testified that he and his wife had been close friends of the testatrix for many years and had visited her in the hospital up to about August 15, 1945. Plaintiff offered to prove by the witness that at one time, when testatrix was leaving his house, she said she was going to visit an uncle. Objection was made to this testimony which was sustained by the court. Plaintiff duly excepted. We are of the opinion that error is not shown by this point for the reason that the witness Pettitte gave substantially the evidence that was excluded at another place in his testimony and the same was admitted without any objection.

By point 18 plaintiff complains because the trial court refused to instruct the jury "that this suit by Mr. Kolb inures to the benefit of all the heirs of testatrix." There is no showing that this requested charge was ever reduced to writing and presented to the trial court for his action thereon. If such a charge had been requested in writing, it should not have been given. It is improper for the jury to know the effect of their answer to the special issues submitted. Therefore, error is not shown. 272 and 273 Texas Rules Civil Procedure.

By other points, plaintiff complains of the action of the trial court in sustaining objections to certain testimony offered and contends that the trial court, in his rulings, became impatient with counsel and that his attitude was such that the plaintiff's case was injured and prejudiced thereby. We have carefully examined the bills of exception pertaining thereto, and although it is apparent that the trial court may have become impatient to a certain degree with counsel, looking at the record as a whole, it is our opinion that the plaintiff received a fair and impartial trial at the hands of the court and that no injury is shown to have resulted to plaintiff by any action or ruling of the trial court.

We have carefully examined all points raised by the plaintiff in his brief and we find no merit in any of them and the same are hereby expressly overruled. We find no reversible error in the record under the points as presented and the judgment of the trial court is, therefore, affirmed.